10. Pro se

13-3564

filed per order

# UNITED STATES CIRCUIT

## COURT OF APPEALS

### FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| CARL ALBERT COURTRIGHT, III, | ) On Appeal from the United |
| Petitioner, | ) States District Court for the |
| | ) Southern District of Illinois |
| | ) (East St. Louis) |
| | ) |
| vs. | ) RE: Case No. 12-cv-1078-DRH |
| | ) 07-cr-30179-DRH |
| | ) |
| UNITED STATES OF AMERICA, | ) Honorable David R. Herndon |
| Respondent. | ) United States District |
| | ) Chief Judge Presiding. |

BRIEF AND ARGUMENT

OF

CARL ALBERT COURTRIGHT, III

U.S.C.A. — 7th Circuit
FILED
DEC 1 0 2013 EF
GINO J. AGNELLO
CLERK

U.S.C.A. — 7th Circuit
RECEIVED
DEC 0 9 2013 EF
GINO J. AGNELLO
CLERK

U.S.C.A. — 7th Circuit
DEC 0 9 2013 DDS
GINO J. AGNELLO
CLERK

Carl Albert Courtright, III

Reg. No.: 07860-025 A-1/227L

United States Penitentiary

P.O.Box 24550

Tucson, Arizona 85734-4550

PETITIONER-APPELLANT

ORAL ARGUMENT REQUESTED

CERTIFICATE OF SERVICE

The Petitioner certifies that he placed in the institutional mailing system at the USP Tucson, Arizona, 3 copies of the following document:

*** MOTION UNDER 28 U.S.C. § 2253 TO OBTAIN A CERTIFICATE OF APPEALABILITY AND APPEAL TO MEMORANDUM & ORDER ISSUED BY DISTRICT JUDGE DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 ***

The(se) copy(ies) is(are) addressed to the following listed person(s)    ⇔07860-025⇔
Seventh Cr Court of Appeals
07-Cr-30179-Drh Dst.So.Il
219 S Dearborn ST
Room 2710-A
Chicago, IL 60604-1702
United States

The Petitioner has affixed the proper first class postage and mailed the said document(s) on the 29th day of November, 2013 all in accordance with 28 U.S.C. § 1746.

In accordance with the "mailbox rule" HOUSTON v LACK, 487 U.S. 266,271 (1988), a pro se litigants documents are deemed to have been filed when placed in the hands of prison officials for mailing.

Respectfully,

Carl Albert Courtright, III
Reg. No. 07860-025 A-1/227L
United States Penitentiary
P.O.Box 24550
Tucson, AZ 85734-4550

Carl Albert Courtright, III

Reg No. 07860-025 A-1/227L

United States Penitentiary

P.O.Box 24550

Tucson, Arizona 85734-4550

---

UNITED STATES CIRCUIT

COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| CARL ALBERT COURTRIGHT, III, | ) On Appeal from the United |
| Petitioner, | ) States District Court for the |
| | ) Southern District of Illinois |
| | ) (East St. Louis) |
| | ) |
| vs. | ) RE: Case No. 12-cv-1078-DRH |
| | ) 07-cr-30179-DRH |
| | ) |
| UNITED STATES OF AMERICA, | ) Honorable David R. Herndon |
| Respondent. | ) United States District |
| | ) Chief Judge Presiding. |

---

PETITIONER'S MOTION FOR A WAIVER OF TECHNICAL

REQUIREMENTS DUE TO UNAVAILABLE RESOURCES

AT USP TUCSON

---

COMES NOW, the Petitioner, a pro se inmate litigant in
the above cited appeal to request a waiver of certain

technical requirements in this Petitioner's filing of this appeal.

USP Tucson has a copier available to inmates. For the previous two weeks (due to holiday schedules) the copier has been out of service. There is no carbon paper available and the inmate is only authorized to print 3 copies of any motion typed on the word-processor.

Without a copier, the Petitioner is unable to make copies of any exhibits referenced in the appeal. However, all the exhibits are already a part of the record for this 28 U.S.C. § 2255 case in the Southern District Court of Illinois. Most references are to previously filed documents already a part of the civil docket. Any other references are to the transcripts of trial for the instant case being attacked. These resources, as the Petitioner understands, are already a part of this record and already in the hands of this court. Therefore the Petitioner requests a waiver of the inclusion of these documents.

Within this appeal the following abbreviations are used:

- Tr. (Criminal Trial Transcript)
- Cr.Doc. (Criminal Docket Sheet)
- Civ.Doc (Civil Docket Sheet)
- "Denial" (Memorandum and order currently being appealed)
- "Reply" (Petitioner's Reply to the government's response to § 2255 motion)
- "Response" (government's response to the Petitioner's motion under § 2255)

iv

Unless the document is available on the LEXIS NEXIS® CD version at USP Tucson, the page number references are of the actual document as entered into the record and provided to the Petitioner by the clerk of court.

The Petitioner prays for a waiver of any other "technical requirements" that are missing due to the limitations of incarceration and pro se status.

Respectfully Submitted,

Carl Albert Courtright, III

UNITED STATES CIRCUIT

COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CARL ALBERT COURTRIGHT, III, | ) | On Appeal from the United |
| Petitioner, | ) | States District Court for the |
| | ) | Southern District of Illinois |
| | ) | (East St. Louis) |
| | ) | |
| vs. | ) | RE: Case No. 12-cv-1078-DRH |
| | ) | 07-cr-30179-DRH |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Honorable David R. Herndon |
| Respondent. | ) | United States District |
| | ) | Chief Judge Presiding. |

DISCLOSURE STATEMENT

The undersigned, pro se Petitioner, furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party of amicus represented in this case: CARL ALBERT COURTRIGHT, III. Said party is not a corporation.

2. The names of all law firms whose partners or associates have appeared for a party in the district court are are expected to appear for the party in this case:

  * Jeffery Rosanswank, 920-A East Broadway, Ste. 205, Columbia, MO 65205;

  * Judith Kuenneke, 401 W.Main St, Benton, IL 62812;

  * Renee E. Schooley, 650 Missouri Ave. Ste.G10A, East

St. Louis, IL 62202;

     * Timothy J. Capps, 780 E.Grand Ave, Carbondale, IL 62902;

     * Michael Thompson and Nicole Gorovsky, AUSA's, 9 Executive Drive Ste. 300, Fairview Heights, IL 62208;

     * James Anthony Silver, USDOJ, 1400 New York Ave. NW, Ste.600, Washington, D.C. 20530;

     * Gareth Morris, 1704 N.Dayton St., Ste.100, Chicago, IL 60614; and

     * Carl Albert Courtright, III, Pro Se Petitioner, Reg.No. 07860-025, United States Penitentiary, 9300 S.Wilmont Rd, P.O.Box 24550, Tucson, AZ 85734-4550.

Dated: November 29, 2013

TABLE OF CONTENTS

PAGE
----

CERTIFICATE OF SERVICE................................... ii

WAIVER OF TECHNICAL REQUIREMENTS......................... iii

DISCLOSURE STATEMENT.................................... vi

TABLE OF CONTENTS...................................... viii

TABLE OF AUTHORITIES................................... X ?

TITLE PAGE OF MOTION................................... 1

JURISDICTIONAL STATEMENT............................... 2

PRO SE PETITIONER STATEMENT............................ 3

GROUNDS FOR COA........................................ 6

ISSUES PRESENTED....................................... 7

STATEMENT OF CASE...................................... 9

SUMMARY OF ARGUMENTS................................... 10

ARGUMENT............................................... 14

I.Judge Herndon demonstrated an apparent personal bias
and antagonistic approach twoards the defense as
evidenced by the record causing a constructive denial
of counsel............................................. 14

II. The trial court abandonded its impartial duties by
acting against the best intrests of justice in it's
failure to hear an untimely filed suppression motion of
evidence unconstitutionally obtained by State of Illinois
actors and given on a "silver platter" to the US Attorney
thereby holding the Petitioner directly responsible for
the negligent actions of court appointed defense counsel
in his delay to file................................... 21

III. On March 6,2009 the government created a "Huge

Mistake" during jury deliberations by intentionally

mishandling evidence leading to a "Big, Big, Big Mistake"

by the court by conducting an ex parte jury communication

and personally had delivering the mishandled evidence to

the deliberation room.................................. 38

IV. The second superseding indicrment issued on February

18,2009 was defective and in vioaltion of the Fifth

Amendment. The court failed to arraign the Petitioner on

the indictment causing prejudice and Rosanswank failed

to move for a dismissal of the fatal indictment......... 45

V. Rosanswank abandonded his loyality to his client by

advocating for the Petitioner's prior convictions and

sex offender status be presented to the jury. Rosanswank

failed to investigate and prepare for this type of trial.

He failed to adversarialy challenge the government's case

and failed to present any experts or witnesses for the

defense............................................... 52

VI. Rosanswank failed to move for a dismissal of count 5

(Bank Fraud) when the government's case contained no

evidence that the person actually guilty of the crime

was the Petitioner.................................... 65

VII. The Seventh Circuit Court of Appeals created a

situation that constructively denied effective assistance

fo counsel whe the Circuit Court relied on the governments

false version of evidence that is not in the record...... 68

VII. The accumulation of all the above errors demand relief

in the form of a cacated judgement in all counts attaching

double jeopardy due to prosecutorial misconduct and abuse

of judicial discretion................................. 71

}X

CONCLUSION.......................................... 72

CERTIFICATE OF COMPLIANCE........................... 74

TABLE OF AUTHORITIES

---

Cases:

------

Houston v Lack, 487 U.S. 266........................ ii

United States v Morgan, 346 U.S. 505................ 4

Powell v Alabama, 287 U.S. 45...................... 4,63

Spencer v Kemna, 523 U.S. 1........................ 5

Donald v Cook, 95 F.3d 548 (7th Cir 1996).......... 5,6

Medellin v Dretke, 544 U.S. 660.................... 6

Porter v. Gramley, 112 F.3d 1308 (7th Cir 1997)..... 6,7

Liteky v United States, 510 U.S. 540............... 14

United States v Barnes, 909 F.2d 1059 (7th Cir 1990). 15

Doe v Prosecutor, 12-2512 (7th Cir 1/23/13)........ 22

Chandler v Miller, 520 U.S. 65..................... 22

United States v R.Enterprises, 498 U.S. 292........ 22

Hale v Hankle, 201 U.S. 43......................... 25

Kerr v United States, 374 U.S. 23................. 27

Katz v United States, 389 U.S. 347................ 28

Smith v Maryland, 442 U.S. 735.................... 29

New York v PJ Video, 475 U.S. 868................. 32

United States v Leon, 468 U.S. 897................ 33

Marron v United States, 275 U.S. 192............. 35

Coolidge v New Hampshire, 403 U.S. 443........... 36

Northrop v Trippett, 265 F.3d 372 (6th Cir 2001)..... 37

United States v Touloumis, 771 F.3d 235.......... 41

Pitsonbarger v Gramley, 103 F.3d 1293 (7th Cir 1996). 42

United States v Gypsum, 438 U.S. 422............. 42

United States v Cronic, 466 U.S. 648............. 46,57

United States v Sellers,645 F.3d 830 (7th Cir 2011). 46

United States v Snyder,189 F.3d 640................ 49

United States v Bali,470 U.S. 856................. 49

United States v Schales,546 F.3d 965 (9th Cir 2008). 50

United States v Faulds,612 F.3d 566 (7th Cir 2010).. 50

Smith v Doe,853 U.S. 83......................... 55

Nix v Whiteside,475 U.S. 157.................... 56

Faretta v California,422 U.S.806................ 56

Strickland v Washington,104 S.Ct. 2067........... 56

Anders v California,386 U.S. 738................ 58

Harris v Reed,894 F.2d 871 (7th Cir 1991)......... 58

Davis v Lambert,388 F.3d 1052 (7th Cir 2003)....... 59

Washington v Hofbauer,229 F.3d 689 (6th Cir 2000)... 60

United States v Cotnam,88 F.3d 487 (7th Cir 1996).... 61

Statutes:

----------

28 U.S.C. § 2253.............................. ii,2,3

28 U.S.C. § 2255.............................. ii


28 U.S.C. § 1746.............................. ii

28 U.S.C. § 1291.............................. 3

28 U.S.C. § 2252.............................. 48,49

Carl Albert Courtright, III

Reg No. 07860-025 A-1/227L

United States Penitentiary

P.O.Box 24550

Tucson, Arizona 85734-4550

---

UNITED STATES CIRCUIT

COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| CARL ALBERT COURTRIGHT, III, | ) On Appeal from the United |
| Petitioner, | ) States District Court for the |
| | ) Southern District of Illinois |
| | ) (East St. Louis) |
| | ) |
| vs. | ) RE: Case No. 12-cv-1078-DRH |
| | ) 07-cr-30179-DRH |
| | ) |
| UNITED STATES OF AMERICA, | ) Honorable David R. Herndon |
| Respondent. | ) United States District |
| | ) Chief Judge Presiding. |

---

MOTION UNDER 28 U.S.C. § 2253 TO OBTAIN A CERTIFICATE

OF APPEALABILITY AND APPEAL TO MEMORANDUM & ORDER

ISSUED BY DISTRICT JUDGE DENYING PETITIONER'S MOTION

UNDER 28 U.S.C. § 2255

---

Comes Now, the Petitioner, a pro se inmate in Federal

Prison, to appeal to the Honorable Justices and Judges of

1

this Seventh Circuit Court to issue a "COA" Certificate of
Appealability under 28 U.S.C. § 2253 and Rule 22(b)(1) of the
Federal Rules of Appellate Procedure, to appeal the final
"MEMORANDUM & ORDER" (herein "Denial")(Cv.Doc.29) as
adjudicated by The Honorable David R. Herndon, Chief Judge for
the Southern District of Illinois, in which he denied the
Petitioner's petition under 28 U.S.C. § 2255 and further
denied to issue a Certificate of Appealability to the
Petitioner.

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern
District of Illinois had jurisdiction pursuant to 28 U.S.C.
§2255, which provides exclusive jurisdiction over collateral
attacks against the original sentence and judgement of
Criminal Case Number 07-cr-30179-DRH, as entered and tried in
said district under 18 U.S.C. §3231.

On September 28,2012, the Petitioner filed a timely
petition under 28 U.S.C. § 2255 (Civ.Doc 1). In that petition
and subsequent amendments there were a total of 15 claims
raised. The government timely entered a "Response"(Civ.Doc.14)
addressing the merits of the 15 claims. On October 30,2013,
The Honorable Chief Judge David R. Herndon entered a
"Memorandum & Order"(Civ.Doc.29) Denying the Petitioner's 15
claims and denied the issuance of a COA (Certificate of
Appealability).

In accordance with 28 U.S.C. §2253 and Federal Rules of
Appellate Procedure Rule 22(b)(1), If the district judge has

2

denied the certificate of appealability, the applicant may request a circuit judge to issue it.

The appeal is from the district court's final "Memorandum & Order"(Civ.Doc.29) in a civil case entered on October 30,2013. The United States Circuit Court of Appeals for the Seventh Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. 2253(c) based on the following particulars:

> Date of "Memorandum & Order" sought to be reviewed:

The Order was imposed October 30,2013(Civ.Doc.29)

> Filing date of Notice of Appeal:

November 25,2013(Civ.Doc.30?)

PRO SE PETITIONER'S PETITION TO BE HEARD ON ITS
MERITS AND NOT DENIED ON TECHNICAL GROUNDS

This Petitioner is filing this motion pro se without the assistance of any legal professionals. Based on the LEXIS NEXIS® CD version that is provided as a "law library" at USP Tucson, AZ, the Petitioner will attempt to adhere to the rules and procedures in this filing. Being an inmate, some resources are unavailable to comply with all of the technical requirements.

However this pro se Petitioner is at a great disadvantage based on the rules. First, as indicated, the Petitioner is "pro se" lacking the legal training and experience required to know the most economical methods of presenting claims. Second, unlike other cases where only a few constitutional violations may have occurred, the Petitioner's case is riddled with quite

3

literally more violations than this Petitioner could argue in
a thousand page document. The Petitioner would almost have to
attack line by line the entire process from indictment to line
by line of transcript.

Out of respect for this courts valuable time and in an
attempt to receive justice in a manifestly unjust case, the
Petitioner has reduced his original 15 claims § 2255 motion
down to the 7 most meritorious claims and 1 obvious cumulative
effect claim.

> "[I]n behalf of the unfortunates, federal
> courts should act in doing justice if the
> record makes plain a right to relief."
> UNITED STATES v MORGAN, 346 US 505

Consequently, even with this major reduction of issues,
the Petitioner is still bound to be 2000 words over the limit
as allowed in Rule 32(a)(7)(B).(half of this 2000 words are
all before the Petitioner's claims are even stated, i.e.
jurisdiction statement, pro se statement, and other relevant
and required formalities). On this issue the Petitioner begs
the mercy of this court for an exception to the 14,000 word
limit. A Compliance Certificate with the total count is at the
end of this filing.

> "[T]he right to be heard is the very core
> of due process." POWELL v ALABAMA, 287 U.S. 45

As with any pro se Petitioner, this Petitioner has to als

o be concerned that this court will "generically rule" like
the district court below it, and will justify their dismissal
on the "merits" of the claims based on the "entirety of the
record" instead of the issues as presented. Due to this
concern the Petitioner was required to file this extended
length motion to avoid any injustice from occurring based on
this unidentified part of the "entire record" used to support
the district courts denial of motion under section 2255.

> "[A]n incarcerated convicts challenge to
> the validity of his conviction always satisfies
> the case-or-controversy requirement, because
> the incarceration constitutes a concrete
> injury, caused by the conviction and redressible
> by invalidation of the conviction." SPENCER V
> KEMNA, 523 U.S. 1,7

The Seventh Circuit recognizes that pro se litigants
require technical considerations, assistance and leeway:

> "[I]t is by now axiomatic that... courts
> have a special responsibility to construe
> pro se complaints liberally and to allow
> ample opportunity for amending the complaint
> when it appears that by doing so the pro
> se litigant would be able to state a
> meritorious claim(s). Not only [are] the...
> court[s] to view the pro se complaint
> with an understanding eye, but while the

> court is not to become an advocate, it is
> incumbent on it to take appropriate
> measures to permit the adjudication of
> pro se claims on the merits, rather than
> to order their dismissal on technical
> grounds." DONALD v COOK, 95 F.3d.
> 548,555 (7th Cir 1996)

In the best interests of justice, this Petitioner prays
for this courts mercy and leniency when reviewing this motion
and pardoning any excess of verbiage or other technical
errors.

### GROUNDS FOR A COA

The Petitioner will offer many claims and support said
claims with transcript citations and other tangible evidence
from the trial itself to prove that the Petitioner's rights
were more than "substantially" violated. This evidence is of
such a nature that any reasonable person, especially a jurist,
would debate the issues presented. In the end, this court will
see a manifest injustice has occurred and requires
correction.

> "[A] certificate of appealability may be
> granted only where there is a substantial
> showing of the denial of a constitutional
> right." MEDELLIN v DRETKE 544 U.S. 660,
> 666 (2005)(internal quotations omitted);
> "in that these issues are debatable among

jurists of reason." PORTER v GRAMLEY, 112

F.3d. 1308,1312 (7th Cir 1997)

What is sad, in the eyes of justice about this appeals case, is that everything that the Petitioner will argue below is DIRECTLY from his "Reply" to the government's "Response" to the Petitioners § 2255 motion. This includes prevailing case law, statements of fact and other arguments. No new material has been added with the exception of the judicial prejudice argument. It appears as if Judge Herndon merely skimmed the document to find reasons to deny the motion instead of seeing the merit contained in the claims that demand relief. The Petitioner prays this court to take the extra step and time to read the Petitioner's "Reply".

ISSUES PRESENTED:

_____

1.      Did the Honorable David R. Herndon, Chief Judge for the Southern District of Illinois, demonstrated through his words, actions, and myopic insistence to render arbitrary rulings intentionally antagonistic towards the Petitioner Carl Albert Courtright, III, have an apparent bias and prejudice as evidenced by these events? Did such an antagonistic atmosphere against the defense constructively deny the Petitioner effective assistance of counsel as guaranteed by the Sixth Amendment by rendering Rosanswank or even a "fully competent" attorney's likelihood of effectiveness "so small that a presumption of prejudice is appropriate?" Was Gareth Morris ineffective for failing to appeal on this issue?

2.     Did the court abandon it's duty to serve the ends of justice by failing to hear and rule on a meritorious motion to suppress all the evidence and "fruit of the poisoness tree" that was obtained through an unconstitutional investigation in violation of the Petitioner's First, Fourth, Fifth, and Fourteenth Amendment's, solely by state actors acting under a state action and then given to the government on a "silver platter"? Did this action constructively deny effective assistance of counsel or was Rosanswank ineffective for failing to timely file such motion to be heard and ruled upon by the court? Was Gareth Morris ineffective for failing to appeal on these grounds?

3.     Did the "huge mistake" by the government and the "big, big, big, mistake" committed by the court on March 6,2009, cause the verdicts in counts 1,2,5 to be prejudiced and thereby demand that said verdicts be vacated? Did the court fail in making a motion sua sponte to vacate these verdicts, or was Rosanswank ineffective for failing to make the motion to vacate? Was Gareth Morris ineffective for failing to appeal these verdicts?

4.     Was the Second Superseding Indictment and by extension the jury instructions in violation of the Fifth Amendment? Did the court's failure to ensure arraignment on this indictment prejudice the Petitioner? Did the court's failure to grant a continuance based on a new charge in the indictment and other grounds constructively deny effective counsel to the Petitioner? Was Rosanswank ineffective in his failure to challenge the Second Superseding Indictment and in ensuring that the Petitioner was arraigned? Was Gareth Morris

ineffective for failing to appeal this issue?

5.    Did Rosanswank abandon his loyalty to his client when he advocated for the Petitioner's previous conviction and status as a sex offender be heard by the jury? Was Rosanswank ineffective for failing to investigate, hire and consult experts, failure to adversarialy test the government's case, and due to his admitted inexperience in a technologically advanced case?

6.    Did Rosanswank act incompetent and was he ineffective for failure to recognize that there was no evidence presented by the government in count 5 (Bank Fraud) to prove beyond a reasonable doubt, or even by preponderance of evidence that it was the Petitioner who attempted to commit the crime as charged? Was Rosanswank ineffective for failing to challenge the forfeiture and restitution orders when there was no documented loss due to the fact this was only an "attempted" crime (as confirmed by the probation departments PSR)?

7.    Was Appeals Attorney Gareth Morris rendered ineffective by this Circuit Court of Appeals when this court used facts and evidence that are not in the record, but were intentionally provided by the government to mislead this court, and used to justify a harmless error ruling in the Petitioner's direct appeal?

8.    Did the accumulation of all these events deprive the Petitioner of a fair, impartial and just trial?


STATEMENT OF THE CASE:

The Petitioner was found guilty of all the counts on case

07-cr-30179-DRH as listed in the Second Superseding
Indictment. Counts 1,2,and 5 were signed by the jury on March
6,2009 and counts 3 and 4 were signed on March 9,2009. The
verdicts were read and entered into record on March 9,2009.
Subsequently the Petitioner was Sentenced to Life plus 10
years on July 17,2009.

On July 24,2009, a timely Notice to Appeal was filed.

On January 13,2011, the Seventh Circuit affirmed the
Petitioner's conviction finding "harmless error" in the
granted inadmissibility of evidence claims.

On October 3,2011, the Supreme Court denied the
Petitioner's petition for writ of certiotati.

On September 28,2012 the Petitioner filed a timely motion
under 28 U.S.C. § 2255.

On October 30,2013, the District Court for the Southern
District of Illinois issued a "Memorandum & Order" denying the
Petitioner's § 2255 motion and denying the issuance of a COA.
No evidentiary hearing was granted.

On November 25,2013, the Petitioner, in accordance with
the Rules of Appellate Procedure Rule 3 and Rule 4(a)(1)(A),
and 28 U.S.C. § 2253, filed a timely notice to appeal with the
Clerk of the U.S. District Court of Southern Illinois.


SUMMARY OF ARGUMENTS

---

*       The Petitioner has claimed his innocence of these
charges from the first day. Even before there was an alleged
crime to investigate, the Attorney General for the State of
Illinois, with an apparent political and vindictive motive,

chose to violate the First, Fourth, Fifth and Fourteenth Amendment Rights of this Petitioner and a specific class of persons with no reasonable cause or suspicion other than the fact that these person had committed a crime in the past. She then searched for evidence that she could use to create an investigation based solely on the fact that a group of persons were registered sex offenders. It is because of the title "sex offender" that this has been permitted to advance to this stage of reality. Had this group of persons been bank robbers, or murders, or even drug dealers, the Attorney General would have not even attempted such an unconstitutional action. However by playing public hatred, headlines, and an overall desire to punish this group of persons she has succeeded thus far.

*    The Petitioner will show through transcripts and other evidence from the trial that to further this violation of rights, Chief Judge Herndon had been and still is acting with bias and prejudice against the Petitioner by making arbitrary rulings, "taking the government at its word without viewing the evidence", this even against the direct and specific facts and objections by the defense. He has violated even the most s implest and plain rules of The Federal Rules of Criminal Procedure, invented evidence to support his myopic and arbitrary findings, acted as a medical expert in open court in order to deny a motion, and has done whatever he feels is necessary to rule against the Petitioner thereby denying fair justice.

*    Mr. Jeffery Rosanswank was ineffective from the day he filed pre-trial motions in this case. Making an argument that

required medical evidence to substantiate, he failed to even go to www.webmd.com or www.FDA.gov to obtain this evidence. In preparing for a trial that involved internet usage, cable modems, IP addresses, file dates and times, access to files, specifics in how programs work, and many other highly technical aspects, Rosanswank failed to even consult any experts to help support any theory of defense and did not present any evidence or testimony for the defense during the trial. This resulted in the government's case being given with no meaningful adversarial challenges as Rosanswank did not know what to challenge in the government's testimony. Rosanswank was disloyal to his client in advocating to admit evidence of the Petitioner's prior sex offense, that was not a jury matter (it was solely a matter for the court at sentencing), to be heard by the jury. Even if it was somehow a "jury matter" a simple stipulation of the fact with no extrinsic evidence as to the offense would have sufficed and drawn a minimal prejudicial effect. The case was not charged because the Petitioner was a "sex offender", the case was because the Petitioner was accused of specific federal offenses. This level of incompetence is shocking to the conscience. The whole idea of "innocent until proven guilty" is to not be convicted because of a crime you were convicted of in the past and deserve more punishment.

\*    The Petitioner was convicted of counts 1,2,and 5 of the Second Superseding Indictment after the "huge mistake" made by the government in the mishandling of the evidence during deliberations and the "big, big, big mistake" made by the court in creating a presumption of prejudice to enhance the

governments "huge mistake" by hand delivering evidence, ex parte, to a jury while they were in deliberations. Rosanswank was ineffective for failing to move for the dismissal of these counts after these "mistakes" occurred and prejudice attached to the verdicts.

\*    Rosanswank failed to take notes during the testimony and evidence presented against the Petitioner on the count of Bank Fraud (Count 5). Had Rosanswank been competent, he would have noted that the only evidence presented was an attempted fraud against Regions Bank. There was no evidence presented that the Petitioner is the person who was guilty of the specific offense of Fraud as charged in the Second Superseding Indictment. There was a cornucopia of evidence that was presented that the Petitioner was an Ordained Pastor, had a credit card scanner, had an ID card printer, may have been involved in some other unrelated check cashing scheme (heresy by govt. witness who said that he was working with the Petitioner to cash checks, but no evidence other than his words), yet there was no evidence to prove it was actually the Petitioner who committed the attempted Bank Fraud. There was no evidence that the Regions Bank suffered a loss of ANY monies due to this attempted Bank Fraud. Therefore Rosanswank and Morris were ineffective for failing to appeal this conviction for lack of evidence of a crime being committed by the Petitioner.

\*    On January 13,2011 the Seventh Circuit Court of Appeals entered a decision against the Petitioner's direct appeal of his criminal case. This decision was based on the altering of testimony made by government witnesses, the rearranging of

testimony between witnesses, inclusion of testimony that does not exist and the ineffective assistance of trial counsel for not challenging the admittance of evidence of the Petitioner's status as a registered sex offender. This rendered Appeals Attorney Gareth Morris ineffective. There is no way to represent a defendant against evidence that is "made-up" along the way.

ARGUMENT

I. JUDGE HERNDON DEMONSTRATED AN APPARENT PERSONAL BIAS AND ANTAGONISTIC APPROACH TOWARDS THE DEFENSE AS EVIDENCED BY THE RECORD CAUSING A CONSTRUCTIVE DENIAL OF COUNSEL.

This court reviews a Judges Actions de novo for plain error to determine if there is evidence of bias or prejudice against any parties in a case.

> "[e]vents occurring in course of current proceedings may constitute basis for recusal motion if they established deep-seated favoritism or antagonism that makes fair judgement impossible." LITEKY v UNITED STATES, 510 U.S. 540,555

The Petitioner filed a motion under 28 U.S.C. § 455,144 in April of 2013, prior to the trial courts ruling on this case. The motion was heard and denied by Judge Herndon who was the one whom was being moved to recusal. § 455 reads in part that such bias can be apparent.

14

"[a]lleged facts sufficient if they would

convince reasonable person bias exists."

UNITED STATES v BARNES 909 F.2d 1059,1071

(7th Cir 1990)

The Petitioner will list numerous events that will not

only show an obvious and apparent bias but would shock the

conscience of any reasonable person to learn that such actions

were allowed to occur during an "impartial" trial. For clarity

the Petitioner will "bullet-point" each event.

\#     EVENT ONE: On February 18,2009 the government obtained a

Second Superseding Indictment against the Petitioner

(Cr.Doc.67). On February 23,2009 Defense Counsel moved for a

continuance and to reopen pretrial motions (Cr.Doc.75). In the

motion, Rosanswank stated, very clearly, that he required more

time to prepare. He claims he was inundated with hundreds of

pages of papers including documents from the Petitioner's

previous counsel, cites that there is a Second Superseding

Indictment with a new charge and feels he failed on pretrial

due to not being prepared. Rosanswank states that in order for

him to "purge" any ineffectiveness that he needs a

continuance.

On February 24,2009 Judge Herndon systematically denied

the motion (Cr.Doc.78). Judge Herndon, in Doc.78, states that

"the court takes the government at its word that it adds no

new evidence... Without viewing the evidence, it is

presumed..." ("Denial" pp.17). This statement alone is

15

irrefutable evidence that the judge was antagonistic against the defense and biased towards the government. The mere fact that a new charge was added is enough to cause an impartial judge to pause before continuing to trial. Yet the judge chose to believe the government and not the defense. How can this be impartial if the judge did not even review the evidence? It cannot.

To further this bias, six days after the denial (Cr.Doc.78), on the first day of trial (Tr.3/2/09,pp.30 lines 17-18), Rosanswank renewed his motion for a continuance because within that six days he had received several hundred more papers. Again the judge denied defense's motion based solely on the governments explanation. This, makes the judge a "rubber stamp" for the government biased position.

Despite Rosanswank's twice attempt to explain to the court that he was not prepared for trial, the second being the day of trial itself, Judge Herndon states "Rosanswank was prepared for trial and diligently represented his client" ("Denial" pp.17). HUH? How can the court determine that counsel was prepared? Especially when counsel, on record, claimed otherwise. This is obvious antagonism towards the defense.

These facts alone supports the CRONIC exception to the STRICKLAND standard of ineffective assistance. The court created an unwinnable trial by refusing to allow counsel time to prepare. This triggers a "presumption of prejudice" without a further look into the trial. Either CRONIC applies, or Rosanswank's own words in the motion prove he was illprepared at trial and therefore was unable to "purge" any

ineffectiveness. It is clear Morris was ineffective for
failing to appeal on this issue.

\#      EVENT TWO: On March 2,2009 Judge Herndon ruled on
evidence under rules 413 and 414. At first the court appeared
impartial when it challenged the government, but when the
government responded with an unsupportable argument that
"accused" means something different than "charged", the judge
replies "Accused. Okay. I see the difference. I missed that
nuance. Okay" (Tr.3/2/09, pp.10-11, lines 24,25,1). Contrary
to very valid objections by defense, the judge again "believed
the governments version". Ironically, the Seventh Circuit
Court of Appeals did in fact rule that there is no difference
between "accused" and "charged" thereby finding this evidence
was admitted erroneously.

    This caused Rosanswank to be ineffective because if the
court only agrees with the government, there is no possibility
that any attorney could provide effective representation.

\#      EVENT THREE: On March 6,2009, Judge Herndon in his
apparent antagonistic approach to anything the defense has to
say, committed a "big, big, big, mistake" which amplified the
government's "huge mistake". (Tr.3/9/09 pp.2, lines 4-13, 20-
21). The court, sided with the government's argument that a
verdict could be returned within the next 30 minutes and
thereby created an ex-parte communication between the trial
judge and deliberating jury concerning matters of evidence in
the trial that was mishandled by the government. (The
Petitioner covers this claim under ARGUMENT IV. of this appeal
as it was a direct § 2255 issue.). This situation created
prejudice in verdicts for counts 1,2,and 5. The court agreed

17

that if these verdicts were reached on March 6,2009 that they
would have had "undue prejudice". Yet ignoring the courts own
ruling, the verdicts stood. Rosanswank was ineffective for
failing to move for their dismissal. The court was
antagonistic for failing to make a sua sponte motion to vacate
these verdicts. Morris again failed to include this
meritorious issue on appeal.

#    EVENT FOUR: Judge Herndon, in apparent antagonism
against the Petitioner, refused to continue the sentencing
hearing on July 17,2009. According to Fed.R.Cr.P. 32(e)(2),
the defendant, defendant's counsel and the government are to
receive a copy of the PSR "at least 35 days" prior to
sentencing. The court nor government disagree, with mail
delivery time and handling delays by the county jail, that the
defendant had not received his copy of the PSR until 29 days
prior to the scheduled sentencing hearing. Rule 32 states it
is only the defendant who can waive this minimum time, yet
when the Petitioner addressed the court to request a
continuance to equal the 35 days, it was denied. This is just
an example of the judge not following the simplest rules and
making up his own rules as he goes along.

Because the Petitioner was denied this 35 days, there
were no family or friends available to testify on behalf of
the Petitioner at sentencing (the defendant's mother was at
the oncologist receiving her initial diagnosis of cancer which
was on that day also diagnosed as terminal leading to her
death a mere 23 days later), thereby leaving only the
prosecutors victim statements as the deciding factor in
determination of sentence. This is blatant bias against the

18

Petitioner.

\#    EVENT FIVE: Although furloughs are not a matter of right, On August 18,2009 the Defendant requested a furlough, or that the court order permission for the Petitioner to attend his mother funeral. Again displaying antagonism towards the Petitioner, this too was denied.

\#    EVENT SIX: On July 17,2009, Judge Herndon exercised further bias and prejudice against the Petitioner during sentencing. The Judge approved an enhancement of 5 points for "device making equipment" under the Bank Fraud charge. Yet the only equipment presented as evidence was a credit card scanner and ID printer that were not charged nor related to any of the elements listed in the Bank Fraud charge itself. The judge approved a 2 point enhancement for "obstruction of justice" because on February 13,2009, during pre-trial motions, the judge acted as a medical expert and determined that the Petitioner could not have had his will overborne by prescription narcotics and psychotropic drugs. Because the Petitioner disagreed with this finding, the Petitioner was said to have been "obstructing justice". The judge approved a 3 point enhancement because the Petitioner was said to have been on parole on December 15,2007 when an "offer of child pornography" was alleged, yet never proven or presented to the jury or judge, to have been made. Yet careful examination of the Second Superseding Indictment will show that NONE of the charges, as charged, were before January 7,2007. The Petitioner was off parole on December 17,2007. There can be no enhancement because the Petitioner was NOT on parole for the instant case. This is direct evidence that regardless of what

is impartial and within the law, Judge Herndon will abuse these laws to exercise his apparent bias towards the Petitioner.

\#   EVENT SEVEN: On October 21,2013 the Petitioner filed a simple motion under Fed.R.Cr.P. 36 to exact a correction of a clerical error that clearly exists between the oral pronouncement and the written judgement (Cr.Doc.186). As the oral pronouncement is not in anyway ambiguous it prevails over any written order. Instead of granting this motion and making the proper correction, Judge Herndon chose to ignore the rules that might benefit the Petitioner and stated "the court now clarifies" that the written judgement is correct (Cr.Doc.187). This implies a Rule 35, that must take place within 14 days of judgement, yet careful review of the entire docket sheet will reveal that no such correction was ever made to the oral pronouncement thereby leaving the written still in error.

This antagonistic approach towards every motion filed by the Petitioner is clear and present proof that it was impossible from the beginning for the Petitioner to receive a "fair trial" in Judge Herndon's courtroom. By precedent and in the interests of justice, this court must rule that the CRONIC exception applies here. There is no possible way to receive effective assistance of counsel inside a courtroom that practices pure antagonism and bias against the defendant whom is "presumed innocent" and facing trial.(there is currently a writ of mandamus filed in this court concerning the Rule 36 matter case # 13-1392).

II. THE TRIAL COURT ABANDONED ITS IMPARTIAL DUTIES BY ACTING
AGAINST THE BEST INTERESTS OF JUSTICE IN IT'S FAILURE TO HEAR
AN UNTIMELY FILED SUPPRESSION MOTION OF EVIDENCE
UNCONSTITUTIONALLY OBTAINED BY STATE OF ILLINOIS ACTORS AND
GIVEN ON A "SILVER-PLATTER" TO THE US ATTORNEY THEREBY HOLDING
THE PETITIONER DIRECTLY RESPONSIBLE FOR THE NEGLIGENT ACTIONS
OF COURT APPOINTED DEFENSE COUNSEL IN HIS DELAY TO FILE.

In May of 2007, the Attorney General of the State of
Illinois issued an unconstitutional subpoena against the
Petitioner and all registered sex offenders whose names were
found to be listed in the Sentinel SAFE Tool® (a program
developed by MySpace® to find all persons in the world who are
registered sex offenders). This subpoena was issued against
the First Amendment Rights of the persons found on this list.
Even registered sex offenders have the right to free speech
and assembly. The subpoena itself:

> "[s]erved no legitimate interest in protecting
> children... [it was] not narrowly tailored
> to serve a significant governmental
> interest... [it attacked a] substantially
> broader than necessary group of sex
> offenders who will not use the internet in
> illicit ways... [the State] has other
> methods to combat unwanted communication
> between minors and sex offenders... [and
> Illinois already has laws that] provide
> punishment for adults who engage in

21

communication with children that intend
to satisfy sexual desires." DOE v. PROSECUTOR,
case no. 12-2512 (7th Cir 1/23/13)

The Constitution applies to the internet as well as
anywhere else. If no crime is being suspected and there is
only a "hunch" because they have committed a crime in the
past, then no person can be deprived of their rights.

"[When the purpose is] law enforcement's
need to detect criminal conduct, the Court
has held that... suspicionless searches are
invalid." CHANDLER v MILLER, 520 U.S. 65,68

Yet the Attorney General's Office felt that she needed to
search for a crime being committed by sex offenders who use
social media. To her, the fact of the title "registered sex
offender" gave her a "hunch" that she used to issue a subpoena
to conduct an illegal constructive search.

"[r]easonable suspicion requires more
than a hunch." GENTRY v SEVIER 597 F.3d.
838 (7th Cir 2010); even "[G]rand juries
are not licensed to engage in arbitrary
fishing expeditions, nor may they select
targets of investigation out of malice or
an intent to harass." UNITED STATES v
R.ENTERPRISES, 498 U.S. 292,298

22

In an obvious attempt to harass a select target group of people, the Attorney General of the State of Illinois issued a subpoena that stated:

> "...under the provisions of the Illinois
> Consumer Fraud and Deceptive Practices
> Act (815 ILCS 505/1 et seq.) and in
> connection with an investigation into the
> activities of MySpace® presently being
> conducted by the Attorney General of
> Illinois, the following books, records,
> documents, and papers in your possession
> custody or control which the Attorney
> General deems relevant and material to
> the investigation to wit;" ("Reply to
> Docket 14, Governments Response to § 2255"
> (herein "Reply"), appendix 37, Exhibit 1).

On it's surface, the subpoena appears to have a legitimate and legal purpose. However the purpose is far from legit, and is unconstitutional. Instead of requesting billing records, or some other records related to some Fraud or Deceptive Practices as identified by the Illinois statute used to issue the subpoena, the Attorney General requests the follo wing information in its stead:

> "All subscriber registration information
> pertaining to any MySpace® user identified
> through the Sentinel SAFE tool as a

23

registered sex offender, including specifically

name, postal code, country, e-mail address,

date of account creation, IP address at

account sign-up and logs..." ("Reply",

appendix 37, Exhibit 1)


It is not until trial that we learn the true nature of

the "fishing expedition" resulting in a "constructive search"

that the Attorney General was conducting. It had NOTHING to do

with the "activities of MySpace®" as indicated and executed.

Instead it was an invasion on "registered sex offenders"

rights to free speech, a violation of due process and equal

protection under the law as well a violation of the right to

privacy. There were no, I repeat no, crimes that had been

reported and no specific crimes that were even suspected of

being committed. At trial, Detective Wojtowicz testifies the

following:


"A. The Attorney General's Office, WORKING

WITH MySpace®, had sent a subpoena to

MySpace® regarding registered sex offenders

in Illinois. THE PURPOSE BEHIND THIS WAS

that MySpace® is a popular social networking

site where many kids were on meeting people,

making friends, just hanging out, spending

a lot of their time. So they sent a subpoena

requesting that the list of Illinois'

registered sex offenders be checked..."

(Tr. 3/3/09, pp 7-8) (emphasis mine)

24

Surprise, the Attorney General's Office was NOT
"investigating the activities of MySpace®, but was in fact
"working with MySpace®" and searching to detect some sort of
criminal conduct that may or may not be happening on MySpace®
by infringing upon First Amendment protections of sex
offenders. Even so, and contrary to the Detective's testimony,
the Attorney General did not isolate just Illinois registered
sex offenders in her subpoena, she used the words "All" and
"any" and even needed to know the "country" and "postal code"
of the persons on the list. She had not a clue if a crime was
being committed in Illinois or anywhere else. This is far less
than even a "hunch" and was more like draining the pond to see
what was on the bottom as opposed to "fishing".

> "[T]here was, in fact, no action pending
> [against any person registered as a sex
> offender or any other persons], for there
> can be no action, or prosecution, or even
> criminal proceeding until after someone
> has been formally accused of acts constituting
> a criminal offense..." HALE v HANKLE
> 201 U.S. 43,46

Even with this overwhelming evidence and testimony, Chief
Judge Herndon, under the heading of "Procedural and Factual
History", in an obvious attempt to mislead this Circuit Court,
and apparently to attempt to justify his arbitrary denial of
the Petitioner's claims states on record:

"In May 2007, as part of a computer crime
task force, the Illinois Attorney General's
Office served a subpoena on the social
networking website MySpace® regarding
registered sex offenders in Illinois,
BASED ON information it had received of
possible crimes in the Granite City,
Illinois area." ("Denial" pp.3)(emphasis mine)

Huh? Where did the judge get this information of "crimes"
from? This is in direct contradiction to the actual subpoena
("Reply" appendix 37, Exhibit 1) and the trial transcript that
the judge himself sites as the source of his version of
events. It appears that the judge has chosen to believe the
governments version of events as he quoted the government
("Denial" pp.10) and made the evidence prove that the
"administrative subpoena was served within the scope [of] the
power of the Illinois Attorney General's Office." To do this,
the judge rearranged and restated the actual undisputable
testimony in order to create this purpose. If it could be said
that the judge, a trained and experienced jurist, "misread"
this testimony and was "confused", how much more would
"normal" persons on a jury be confused if they only heard the
testimony and did not have the benefit of a written
transcript?

What makes such a claim worse is neither the court nor
the government site any authority to substantiate their claims
of authority for the Attorney General's Office. In

26

juxtaposition, the Petitioner cited numerous cases from the
Illinois Supreme Court (the governing authority for questions
of State application of State Law), that demonstrate that the
Attorney General's Office has no such powers under the
statutes used. (see "Reply" appendix pp.6-12 Attachment 1).
This action by the court again proves an antagonistic bias
towards the Petitioner. It is as if the Petitioner has no
First, Fourth, Fifth, or Fourteenth Amendment protections
because he is a "registered sex offender". This is wrong.

> "[W]hile the language of the Fourth
> Amendment is general, it forbids every
> search that is unreasonable; it protects
> all, those suspected or known to be
> offenders as well as the innocent." KERR
> v. UNITED STATES, 374 U.S. 23,33

In order to further antagonize the Petitioner and avoid
the truth, the court states (in agreement with the government)
that the "defendant acknowledges that he had no right to
privacy in the result of the subpoena". Again this is without
cite or authority. Ironically the Petitioner did in fact argue
that he had a FULL expectation to privacy in the information
("Reply" appendix pp.18 attachment 1). The Petitioner
demonstrates that the expectation attached when the website
was created using a password and username. The privacy
settings also indicate that the Petitioner did not disclose
such information to the public and the MySpace® privacy
agreement stated that the information was private, absent a

valid investigation into a valid crime. Without the Petitioner

having been accused of a crime using MySpace®, the Attorney

General's Office investigating the accused crime, issuing a

subpoena specifically requesting the Petitioners status and

information as a MySpace® user related to such a crime, there

is no possible way for the information to have lost any

privacy interests.

> "[T]he Fourth Amendment protects people
> not places... the person [must] have
> exhibited an actual expectation to
> privacy and that the expectation is one
> that society is prepared to recognize as
> reasonable." KATZ v UNITED STATES, 389
> U.S. 347,361

It is common sense that when a person assigns a password

and username to some information that the person intends to

keep such information private. This is our normal behavior in

today's society. If no privacy was expected, we (society)

would not bother with passwords. Based on the logic of the

government, if I give my password to the bank for banking

purposes, I should loose my privacy expectations. Yet, when I

call my Doctor's office I do not loose any expectation of

privacy to any information because I called him. When I, for a

business purpose, disclose my IP to a company and assign a

password, I do not loose an expectation to privacy. The same

as if I choose to anonymously visit a religious website, or

charity, or research a medical issue on webmd. Just the fact a

28

persons IP is attached to their visit does not relinquish any
expectations to privacy to who they are when they visit these
sites. Otherwise it is contrary to the rights that the
Constitutions protects.

> "[T]hose who disclose certain facts to
> a bank or phone company for a limited
> business purpose need not assume that this
> information will be released to other
> persons [or] for other purposes." SMITH v
> MARYLAND, 442 U.S. 735,749

Next the court tries to imply that the Petitioner would
have been a subject of some investigation as a matter of
course because "the ICAC database had logged the defendant's
IP address as offering child pornography..." ("Denial" pp.10).
This is unrealistic and without merit. What the government is
describing, and the court is supporting, is as absurd as the
following example.

Imagine investigators driving to the local hardware store
and randomly taking a persons fingerprints from the surface of
a hammer, with no cause other than he is a known drug dealer,
in order to see if that person's prints are logged in the AFIS
database as a person who has allegedly committed a current
unknown and uncharged crime. Or even some investigator
randomly pulling a fingerprint from AFIS and starting an
investigation based soley on that fingerprint by checking
INTERPOL or other databases with no real starting point. Like
the AFIS database, the ICAC database has millions even

billions of IP addresses logged for some alleged (yet unproven and unconfirmed) crime or another. There is no realistic purpose to run all the IP address, or even random IP addresses in this database against the worldwide database of IP address holders, determine who had the IP at that time and then create some sort of investigation. Much like randomly running fingerprints to detect an unknown and unsuspected crime, this simply would not ever happen. The government and the court would have this Circuit believe that somehow the ICAC database already knows that the IP belongs to the Petitioner. However the truth is entirely different. The Attorney General first had the Petitioner's name, then IP address and then began looking for crime. She was not even concerned with whether there were any crimes being committed by the Petitioner physically on MySpace®, the alleged focus of her subpoena. Had she have viewed the Petitioner's webpage she would have discovered that it was a religious website offering prayer and Pastoral Counseling. There was not even the vapor of a crime to investigate on MySpace®.

According to the testimony given at trial;

> "One of them was a response that the name
> Carl Courtright did have a MySpace® page
> on there. Along with that response, they
> responded with an IP address that was
> captured at the time that that MySpace®
> became was created. Based on THAT IP
> address, they THEN cross-referenced that
> IP address with a database... [ICAC]....

> Based on that information, they located
> which company owned this IP address.
> The IP came back to Charter Communications
> out of St. Louis, Missouri... They had
> already sent a subpoena to Charter and
> knew that that IP address came back to
> Sharon Courtright at 3004 Century. Based
> on that, when they contacted me I confirmed
> who the residents were of that house and
> started to lay the foundation for getting
> a search warrant..." (Tr. 3/3/09, pp.8-14)
> (emphasis mine)

The ICAC database did not even identify what company owned that IP, it required more subpoenas to make that determination. The IP could have just as reasonably been owned by some company in China. Then they had to subpoena that company and determine who was using that IP at that specific time. Again it could have just as easily been somebody in China. There is no feasible way that merely because the Petitioner's IP address was allegedly on the ICAC database, for a single incident, that any investigation would have ever ensued. In the real world, as opposed to the government and district courts desires, it would have not.

All of these events did not only violate the First and Fourth Amendments, but the Fifth and Fourteenth Amendments were denied also. How can the Attorney General issue a subpoena for MySpace® activity and then take the results and not investigate MySpace®, but investigate ICAC? This Circuit

cannot allow this subpoena to stand in force. It must be
deemed unconstitutional.

### VIOLATIONS OF DUE PROCESS AND EQUAL PROTECTION

Due Process requires that certain steps be followed
before a person is even suspected, then investigated and then
charged for an alleged crime. The first violation was the
issuance of the subpoena without any crime or suspects or even
allegations of crimes identified. Then comes the alleged
"offer of child pornography". This offer was identified by
what is known as a "hash-tag". The offer itself was never
verified on its own to determine if it met the legal
definition of child pornography. It easily could have been any
image, even an altered image, a corrupt file, or even a virus.
There was NEVER an independent determination by any
investigators involved that the "hash-tag" was actually,
itself, child pornography. Absent this information the
Attorney General's Office still continued this investigation
by issuing subpoena after subpoena all culminating in a search
warrant in Madison County Illinois based on nothing real. Not
even the judge himself determined that the "hash-tag" was
probable child pornography before issuing the search warrant.

> "[W]hen faced with a warrant application
> to search for child pornography, a magistrate
> must be able to independently evaluate
> whether the contents of the alleged images
> meet the legal definition of child pornography."

NEW YORK v PJ VIDEO, 475 U.S. 868,872-74

The judge merely acted as a "rubber stamp" for the police. The judge did not even question the methods used to obtain the information of this alleged "offer". What makes it worse, is that the Detective himself never confirmed that the "offer" was that of actual child pornography before he signed his name to an affidavit for search and claimed under oath that the "hash-tag" was that of personally verified child pornography. This cancels out any "good faith" before the warrant was ever issued.

> "[a] Magistrate must perform his neutral
> and detached function... and not merely
> serve as a rubber stamp for the police."
> UNITED STATES v LEON, 468 U.S. 897

## THERE CAN BE NO GOOD FAITH

The police go on to further violate the Constitution and remove ANY "good faith" from their search, assuming that the warrant could stand on its own as issued.

Detective Wojtowicz, is a seasoned investigator and specifically trained as part of the "cyber-crime-task-force" in Illinois, as testified to and accepted by the court during trial. Being the officer who applied for the search warrant, he was aware that the probable cause for search was the result of an alleged "offer" of child pornography as stated in his affidavit for search. With his experience, and based on his

testimony, he fully knew that this "offer" was made using a very specific IP address that was assigned to a very specific cable modem's ESN and MAC identifiers. There can be only one modem with these combined identifiers. Being experienced, he had to make sure the IP was still active on the day of search and he found that it was. Being sworn to uphold the Constitution he would have taken every precaution not to violate anyones rights. Determining the IP active he then executed the search warrant.

Armed with this knowledge, the first thing, after "securing the scene", the detective did was verify that the IP address and very specific modem ESN and MAC were present at the residence. When the detective found that although the IP was still active somewhere on the Charter system and was still assigned to the same modem ESN and MAC, they were not physically at the residence on Century Drive. The detective, fully knowing the law, was bound to either abandon the search or obtain a new warrant based on new information. However, the detective did not even question the residents as to if they knew of another modem and where it might be. Had he done so, he knew that he would have learned that the IP and modem in question were physically active at 2527 Madison Ave and not on Century Drive.

Because, he in reality was on a "fishing expedition", the detective neglected to do the constitutional and right thing. Instead he unfaithfully executed the warrant as if the modem and IP were actually there on Century Drive. Evidence of the "fishing expedition" only gets more apparent from there.

The warrant gave the description of "a single family dwelling with attached garage and the number 3004 above the garage door". Yet, upon execution, the police searched and seized items from a 24x24 pole barn known to be used for a newspaper business and was detached from the "single family dwelling with attached garage", sitting a good 35feet from the residence (this is proven by the on scene photographs and inventory).

If this was not enough of an abuse of a warrant, the police then proceed to search for evidence of fraud based on information they had previously received from the secret service as part of Kathy Simunich and Drew Johnson "setting Charlie up". Evidence of this is in the questions they asked such as "where is the new pool you bought your mother?" and "Where are all those new TVs you bought?" Because of this, they proceeded to seize numerous items not included on the warrant. These items included two (new in the box) flat screen TV's, one (new and factory sealed in the box) home computer, numerous office supplies, an id card printer, credit card scanner, and many other items as evidenced by the inventory.

> "[T]he Fourth Amendment prevents the
> seizure of one thing under a warrant
> describing another." MARRON v. UNITED
> STATES, 275 U.S. 192,196

This alone would prevent the use of the items NOT listed in the warrant during trial. These items were used by the government to support their case of Bank Fraud against the

35

Petitioner.

> "[A] judgement of conviction must be
> reversed when evidence obtained in the
> course of an unconstitutional search was
> admitted at the accused trial..." COOLIDGE
> v NEW HAMPSHIRE, 403 U.S. 443,468

The entire search resulted in a fishing expedition and "exploratory search". Based on this fact alone a reversal of all the Petitioner's convictions must be entered.

When the court was faced with such a substantial cause and effect proving an illegal subpoena and search, such a motion to suppress would have reasonably succeeded. Striking the motion from record on a technicality that is not the fault of the person who is fighting for their lives in a trial, does not and cannot ever meet the ends of justice. Instead this punishes the Petitioner in lieu of his attorney for something that was 100% the fault of his attorney. This is NOT impartial justice. This only further proves the antagonism against the Petitioner by Judge Herndon.

Failure to hear a valid motion to suppress all the evidence and "fruit of the poisoness tree" used against the Petitioner during trial created a situation, by the courts actions, that constructively denied the Petitioner effective assistance of counsel and the CRONIC exception clearly applies here. No lawyer can defend when the court doesn't even hear a MAJOR suppression motion.

Rosanswank's failure to file such a meritorious motion

and failure to file it in a timely manner was incompetence in the highest degree.

> "[i]t is difficult to imagine what tactical advantage or cost could justify counsel's decision." NORTHROP v TRIPPETT, 265 F.3d. 372,383 (6th Cir 2001)

When Rosanswank first visited the Petitioner, the first and primary strategy and tactics involved the filing of a suppression motion, as devised by previous counsel, before any other tactics or strategies were even to be discussed. Consequently Rosanswank did not timely file the motion as was agreed upon and directed to. He never made any indication to tactics or strategy that would justify failing to do so. This proves ineffectiveness by incompetence and disloyalty (lying to his client) and prejudice because without the evidence, there would be no evidence to suspect, investigate, charge and then convict the Petitioner.

In the court's "Denial" pp.9, the judge states "Notably, Courtright did not appeal this Court's decision to strike the motion as untimely." This indicates that Gareth Morris was ineffective because if he had appealed the "decision to strike" the motion, this claim would have been meritorious and would have resulted in the Petitioner's case being overturned. This is a stronger or equal to argument than was raised.

37

III. ON MARCH 6,2013 THE GOVERNMENT CREATED A "HUGE MISTAKE" DURING JURY DELIBERATIONS BY INTENTIONALLY MISHANDLING EVIDENCE LEADING TO A "BIG, BIG, BIG MISTAKE" BY THE COURT BY CONDUCTING AN EX PARTE JURY COMMUNICATION AND PERSONALLY HAND DELIVERING THE MISHANDLED EVIDENCE TO THE DELIBERATION ROOM.

On March 6,2009 the court directly order both counsels to work with the court officer and make sure that ALL properly ad mitted evidence was taken to the jury deliberation room. (Tr. 3/6/09,pp.35, lines 12-17). Due to the neglect, which is classified as misconduct (intentional or not) and contempt of a court order to give the jury all the properly admitted evidence on the part of the Assistant United States Attorney Nicole Gorovsky, this has to be dealt with to prevent further "huge mistakes" by her. Instead the judge "bent over backwards" to accommodate the AUSA. Then, what ensued next was a "tragedy" of errors that ultimately prejudiced at least three verdicts against the Petitioner.

According to the version of events as described by the judge to the Petitioner on March 9,2009 (oops! the court forgot to have the defendant present on Friday, March 6,2009 during this handling of the mishandled evidence),"it just slipped everybody's mind" (Tr.3/9/09,pp.5, line19) this is what occurred;

Ms. Gorovsky notified the court that she somehow "forgot" to include four pieces of "properly admitted evidence" when the evidence was taken to the jury. HUH? How could this happen, did not the judge specifically order this to be done? Is there not a checklist of the properly admitted evidence to reference? Yet, it happened. According to Judge Herndon this

38

was a "huge mistake on the U.S. Attorney's Office" (Tr.3/9/09,pp.12, lines 2-3). He does nothing to reprimand the attorney. The judge then says that this mistake was made worse because the court made a "big, big, big mistake." (Tr.3/9/09,pp.12, lines 4-13). The Petitioner agrees.

Judge Herndon, explains to the Petitioner, in deciding how to handle the situation that "there is no rule, there's no book for that." (Tr.3/9/09,pp.12, lines 2-3) therefore this is not a "normal" question of law as claimed by the judge in his "Denial" pp.13. Still, because of Judge Herndon's apparent antagonism against the defense and bias in favor of the government in every situation, without the Petitioner in court, he states this is what he was going to do:

> "of course, the government at the time
> was asserting that I should have -- I
> should take the exhibits back, were
> concerned that between 4:30 and 5:00,
> the jury 'could come back with a verdict'
> without having the benefit of those
> exhibits. That was their concern."
> (Tr.3/9/09,pp.12, lines 13-17).

Rosanswank, actually, attempted to dissuade the judge by recommending that the jury dismiss at 5:00 as planned and that the evidence be included on Monday before the jury arrived, thereby drawing no undue prejudice in the evidence. Or even include a note from both counsels and having the court officer make the delivery. Against this, the most logically and

legally fair suggestion, and ignoring the fact that the burden
of proof is upon the government and that it was an error of
the government to start, the judge still sides with the
government and takes the exhibits back with nothing but his
words.

This caused an ex parte communication between the trial
judge and jury that was directly related to physical evidence
that was before the court. In Judge Herndon's "Denial" pp.13,
he cites U.S. v BISHAWI, 272 F.3d. 458,461(7th Cir 2001) to
reference this incident as a "mere occurrence of an ex parte
conversation." However this was not a "mere" conversation .
The judge himself admits that "By the way, putting the one
nonpornographic exhibit on top." (Tr.3/9/09,pp.4, lines 12-
14). Indicating even the judge knew of the "shock" these
exhibits might cause. The Petitioner is merely repeating the
record and what the record truly says. Sadly none of this is
made-up. The Judge then tells the Petitioner;

> "The Court simply informed the jury that
> it was time to begin wrapping up their
> deliberations for that day,..." THEN the
> judge admits the crux of the issue,
> "...while also mentioning that four pieces
> of properly admitted evidence were
> inadvertently excluded from their
> deliberations and that they should not
> attach any significance to the omission."
> ("Denial" pp.15)

40

As admitted, the judge ONLY told the jury not to attach significance to the OMISSION of the evidence. He never instructed them to ignore the fact that the trial judge felt that the evidence was of such importance to the case that he, the trial judge himself, needed to hand carry this obviously important evidence, instead of one of the attorneys or the court officers, to make sure the jury would use it in their deliberations. This evidence was eclectic in nature as it addressed counts 1,2 and 5 specifically. If it was not of vital importance to the case, it could have easily waited until Monday when we reconvened. This is why there is and has to be a presumption of prejudice in these situations.

> "[a] trial judges procedure in entering a
> jury room, despite agreement by... counsel's
> ...undermines the appearance of justice."
> UNITED STATES v TOULOUMIS, 771 F.2d.235
> (7th Cir 1985)

The Petitioner will concede that a conversation like "hey wrap it up for the day", or " what do you want for lunch?", or "my isn't the weather nice?" or even "I am sorry I cannot answer that question for you..." are what the courts mean by "mere occurrence". However speaking to the jury, off record, concerning evidence that was mishandled that is directly related to the matters before the jury's deliberation and of such importance to the government's cases that the need to get it to the jury NOW!, is not "mere conversation".

41

> "[p]rivate communications between jurors
> and others are presumptively prejudicial."
> PITSONBARGER v GRAMLEY, 103 F.3d. 1293,
> 1303 (7th Cir 1996) and the Supreme Court says:
> "[p]regnant with possibilities for error."
> UNITED STATES v GYPSUM, 438 U.S.422,460

Since there is no doubt that an ex parte conversation did occur, and because there is "no rule" on how to handle the situation, we (all sides) are fortunate that the trial judge had the forethought, due to his obvious concern of undue prejudice when speaking with the Petitioner, to create a perfectly impartial test of prejudice. This test was based on the accumulation of all the events that occurred on March 6,2009, and was even done with the hindsight available after the judge had the weekend to think about it. With his vast experience in evidentiary rulings, handling juries, and effects of evidence on a jury the judge declared:

> "there was no prejudicial effect to you
> because they didn't arrive at a verdict."
> (Tr.3/9/09,pp.8, lines 24-25)

This clearly states that because no verdicts were reached on Friday, March 6,2009 that there is no prejudice. However had there been a verdict then prejudice would be attached to such verdicts. In order to clarify his misgivings about how the events of March 6,2009 went, he states:

"when you look back on Friday's mistake[s],
at the end of Friday I was glad, quite
frankly, when they wanted to go home.
That meant to me that the whole episode,
other than costing us some time, probably
meant that it made no difference in their
deliberations." (Tr.3/9/09,pp.13-14,
lines 21-25,1)

These are the "frank" words of the Chief Judge for the
Southern District of Illinois concerning what at the time was
an unprecedented event in his courtroom. The "huge mistake"
and the "big, big, big mistake" with the ex parte
communication had the obvious potential to cause a mistrial or
at least prejudice the verdicts. Yet the prejudice test stood
and must still stand. No verdict, no prejudice. Yes verdict,
yes prejudice.

Clear review of the record will reveal that on March
9,2009, 5 verdicts of guilt were entered against the
Petitioner. However careful reading will indicate that the
verdicts for counts 1,2, and 5 were all decided and signed by
the jury on Friday, March 6,2009. (Tr.3/9/09,pp.17-18, lines
6,11,1).

Based on the ruling of prejudice that stood and has still
not been disputed by any party, even after the Petitioner incl
uded it in his § 2255 and his "Reply", the verdicts on counts
1,2,and 5 all have prejudice attached and therefore must be
vacated due to prosecutorial misconduct. Because of the
Fed.R.Ev. 606(b) we are not allowed to question the jury

43

concerning what evidence they used, or what effect any evidence had upon their verdicts, or if the fact the trial judge hand delivered the evidence had an effect. Because the incident, by presumption of prejudice and test of prejudice, did in fact prejudice the Petitioner, and the fault is that of the government and the court, the only just solution is to vacate verdicts 1,2,and 5.

Judge Herndon make much-a-do about "Courtright did not raise any issue concerning the Court's handling of the evidence on direct appeal." ("Denial" pp.12) This only signifies that Gareth Morris was ineffective in failing to challenge such an obvious and meritorious claim. Had Morris appealed these events, this Circuit would no doubt have vacated the verdicts in counts 1,2,and 5. This prejudiced the defendant because he is doing life on 5 convictions instead of 30 years or less on 2 convictions. The Petitioner is also prejudiced because the verdict to count 5 would be vacated and both the punishment of forfeiture and restitution are attached to that count.(The Petitioner has recently filed an error coram nobis in the deistrict on the matter of restitution).

Mr. Rosanswank was ineffective, incompetent, and unprofessional when he failed to make a motion himself for the court to vacate these verdicts based on the courts prejudice ruling that same day. Again the Petitioner is serving time for 5 convictions instead of 2. The prejudice is obvious.

IV. THE SECOND SUPERSEDING INDICTMENT ISSUED ON FEBRUARY
18,2009 WAS DEFECTIVE AND IN VIOLATION OF THE FIFTH AMENDMENT.
THE COURT FAILED TO ARRAIGN THE PETITIONER ON THE INDICTMENT
CAUSING PREJUDICE AND ROSANSWANK FAILED TO MOVE FOR A
DISMISSAL OF THE FATAL INDICTMENT.

On February 18,2009 a mere 14 days before the trial date
of March 2,2009, the government obtained a Second Superseding
Indictment. This indictment contained a new charge and changed
the physical evidence used to charge the Petitioner in counts
2-4. Only counts 1 and 5 remained unchanged. This alone would
normally call for the Petitioner to be arraigned and a minimum
30 day continuance for trial to be issued. However, neither of
these events occurred.

On February 24,2009 Rosanswank submitted a motion to
continue the trial and re-open pretrial motions (Cr.Doc.75).
The reasons listed for this continuance was the new
indictment, the new charge added to the indictment, being
"inundated with paperwork" and in order to "purge" any
ineffectiveness. Rosanswank clearly informed the court that he
required more time to prepare. This motion was
antagonistically denied by the court. The court stated:

> "the Court takes the government at its
> word that it adds no new evidence since the
> dates cover the same periods of time.
> Without viewing the evidence, it is presumed
> that..." ("Denial" pp.17)

Why did the judge not take the defense at its word when he said he needed more time? It is obvious this was the nature of this judge when this Petitioner was in his courtroom. This constructively denied the Petitioner effective assistance of counsel. The court by "taking the government at its word", "without viewing the evidence", created a situation that was undefendable.

> "[c]ircumstances of such magnitude that,
> although counsel is available to assist
> the accused during trial, the likelihood
> that any lawyer, even a fully competent
> one, could provide effective assistance
> is so small that a presumption of prejudice
> is appropriate without inquiry into the
> actual conduct of the trial." UNITED STATES
> v. CRONIC, 466 U.S. 648,659-60

When defense counsel begs for more time to prepare and is worried about "purging" any ineffectiveness and a court denies such a motion, there is no possible way for a Petitioner to receive effective assistance of counsel.

> "[T]he courts myopic insistence on proceeding
> with the scheduled trial date in face of
> a valid request for a continuance was
> arbitrary and unreasonable... [it] was
> the type of arbitrary rule that the Sixth
> Amendment prohibited." UNITED STATES v

SELLERS, 645 F.3d. 830 (7th Cir 2011)

If the initial denial was not enough, Rosanswank was so concerned with being unprepared and "purging" ineffectiveness that he requested this continuance again on the first day of trial. (Tr.3/2/09,pp.30, lines 17-18). Again the continuance was denied. Because the judge was biased against the Petitioner, the court intentionally denied the effective assistance of counsel.

## THE INDICTMENT VIOLATED THE "FAIR WARNING CLAUSE" AND DOUBLE JEOPARDY

When the Second Superseding Indictment was presented to the Grand Jury, the United States Attorney's Office created a document that violated the Fifth Amendment.

First and foremost the indictment created a crime that was overbroad, over-vague, and ambiguous. In counts 2,3,and 4, the charges include the words "included, but not limited to" in reference to the evidence used to indict the Petitioner. By extension, the jury charge stated that the evidence they could use to convict was "not limited to" the evidence actually indicted and presented to the jury. How can ANY defendant be said to have received "fair warning" of what evidence was being used to charge them with a crime? How could any attorney, even the best and brightest, mount a defense against unknown and unspecified evidence? It is impossible. When the words "not limited to" are included, literally "the sky is the limit" as to what may be used.

47

This fact alone caused the Petitioner to be constructively denied effective assistance of counsel. The government created this situation that was of such a magnitude that no attorney could have provided effective assistance. This also appears to be vindictive prosecution. It is as if the government wanted a conviction so badly that they created an "unlimited" evidence indictment. This demands that the verdicts on counts 2,3,and 4 be vacated due to prosecutorial over-reaching and misconduct. If it was "stating the evidence in a different way", as the government claimed, then why change anything at all?

If that was not evidence enough, counts 2,3,and 4 are multiplicious of each other. Counts 2 and 3 are the same charge 28 U.S.C § 2252(a)(4)(B) for events that occurred "on or about January 7, 2007 and August 9, 2007". In 2007 the charge read as:

> "(a) any person who-- (4) either-- (B)
> knowingly possesses, or knowingly accesses
> with the intent to view, 1 or more books,
> magazines, periodicals, films, video tapes,
> or other matter which contains any visual..."
> 18 U.S.C. 2252(a)(4)(B) 2007

The language of the statute is unambiguous and explains itself. The elements of the offense are "1 or more". The government, being vindictive, intentionally created 2 charges for possession of 2 computers during the exact same time frame. Yet the count of 2 computers is the same as 1 or more

computers as the charge implies. This makes counts 2 and 3
multiplicious of each other.

> "[I]n Kimbrough, the Fifth Circuit held
> an indictment was multiplicious when
> it charged the defendant with two counts
> of violating 18 U.S.C. § 2252(a)(4)(B) on
> or about the same date... The Fifth Circuit
> emphasized that § 2252(a)(4)(B)'s requirement
> that the defendant possess "[one] or more"
> prohibited items showed the legislature
> did not intend for the provision to be
> used to charge multiple offenses." UNITED
> STATES v SNYDER, 189 F.3d. 640,647 (7th
> Cir 1999)

Only one conviction for possession can remain against the
Petitioner.

If the government had not already made enough mistakes,
she charged the Petitioner in count 4 with a violation of 18
U.S.C. § 2252(a)(2) (Receiving). "On or about March 15, 2007".
The receipt involved the same Compaq Laptop that is listed as
possession in Count 3. Because the date "March 15,2007" is on
or about the same time as "January 7,2007 to August 9,2007",
count 3 becomes multiplicious of count 4.

> "[P]roof of illegal receipt of a firearm
> necessarily includes proof of illegal
> possession of that weapon." UNITED STATES

49

v BALI, 470 U.S. 856,862. In UNITED
STATES v SCHALES, 546 F.3d 965,978 (9th
Cir 2008), "Schales thus held that "while
the government can indict a defendant for
both receipt and possession of sexually
explicit material, entering judgement
against him is multiplicious and a double
jeopardy violation." cited in UNITED STATES
v FAULDS, 612 F.3d. 566,569 (7th Cir 2010)

If being multiplicious directly of count 3 was not
enough, it is the governments use of words that cause the
count to also be multiplicious of count 2 also. When the words
"not limited to" were added to count 2, the jury was left with
the option to convict the Petitioner based on the evidence
that was listed in count 4. Or even the evidence in count 1 or
3. Then to further frustrate justice, the government added the
words "not limited to" to count 4. This allowed the jury to
use the evidence in count 1,2,3, or any other known or unknown
evidence to find the Petitioner guilty of receipt of.

Despite the obvious Fifth Amendment violations, Judge
Herndon again being antagonistic against the Petitioner sides
with the government by stating:

"As the government states, the second
superseding indictment did not substantively
change the allegation or potential penalties...
In this instance, the failure to arraign
on the second superseding indictment did

not deprive Courtright of any "substantial
right...". ("Denial" pp.16)

This is wrong. The Petitioner's rights were "substantiall
y violated" because if the court had arraigned the Petitioner
on the second superseding indictment, it stands to reason that
any competent counsel would have discovered the double
jeopardy concerns in the indictment and then moved for its
dismissal. Failure to arraign was compounded by the denial of
continuance based on the second superseding indictment. Again
this caused the Petitioner to be constructively denied
effective assistance of counsel. Had the arraignment been
done, counsel would have more than likely discovered the
multiplicity of charges and moved to correct them.

Rosanswank was ineffective for not discovering these
issues on his own and moving to have the verdicts vacated for
multiplicity. Had Rosanswank been competent the Petitioner
would only have convictions for counts 1 and 5 based on this
information. Morris again failed to appeal this major issue
and is ineffective as the law supports the Petitioner's
argument.

Ironically, Judge Herndon with his apparent antagonism,
again tries to mislead the court by stating "Rosanswank was
prepared for trial..." ("Denial" pp.17). This directly
contradicts Rosanswank's own words in two separate motions one
being on the day of trial claiming he was not prepared. It
appears as if Judge Herndon is still trying to invent reasons
to deny relief to the Petitioner.

Gareth Morris, as Judge Herndon points out "did not raise

5-1

issues surrounding the second superseding indictment or the
Court's denial of continuance on direct appeal" ("Denial"
pp.16), was ineffective for failing to appeal these issues.
Had Morris included these claims, this court would have
granted relief to the Petitioner and either vacated the entire
indictment or at minimum counts 2,3,and 4. The Petitioner has
suffered the injury of multiple convictions for the same
elements of offense.

V. ROSANSWANK ABANDONED HIS LOYALTY TO HIS CLIENT BY
ADVOCATING FOR THE PETITIONER'S PRIOR CONVICTION AND SEX
OFFENDER STATUS BE PRESENTED TO THE JURY. ROSANSWANK FAILED TO
INVESTIGATE AND PREPARE FOR THIS TYPE OF TRIAL. HE FAILED TO A
DVERSARIAL CHALLENGE THE GOVERNMENTS CASE AND FAILED TO
PRESENT ANY EXPERTS OR WITNESSES FOR DEFENSE.

Because a defendant must depend on a symbiotic like
relationship with his appointed counsel, it is imperative that
counsel always act with loyalty in the best interests of his
client. This was not the case with Jeffery Rosanswank.

Even before trial, Rosanswank failed to file a timely
motion to suppress the evidence obtained through an illegal
subpoena and by extension search warrant that was issued by
the State of Illinois to produce a state investigation under
state law. The results of this illegal subpoena were passed
to the government on a "silver platter" and used to convict
the Petitioner. Without this evidence, the government has no
case. After making an agreement with the Petitioner to file
this motion, Rosanswank, being disloyal to his client, filed
it 2 months too late.

His disloyalty does not end there. One of the pre-trial motions that Rosanswank did file was a suppression of statement. This motion was centered around the undisputed fact that the Petitioner was on a post-operative high dose of Percocet® and also Valium® during questioning. There is no doubt the police were aware of this as Detective Wojtowicz was the one who handed the prescription bottles to the Petitioner so he could take these medications prior to being driven by the police, to the police station, to await interrogation in a locked holding room.

> "I told him he could take his medications...
> I looked at the bottles to check that they
> were prescribed to him." (Tr.3/3/09, pp.60,
> lines 14-25)

Knowing that the evidence required to succeed in this motion would be medical in nature, Rosanswank in an effort to sabotage the Petitioner, failed to provide any medical evidence or expert testimony to prove the effects that the medications have on a persons free will. This prompted the court to rule as its own medical expert and state:

> "No evidence was submitted... [and the
> court believes] no evidence was available."
> (Tr.2/13/09,pretrial)

Yet in the experience of this Circuit Court and common sense says that there can be no doubt that a printout from

Walgreens® of side effects, the FDA website, or even a pharmacy technician as a witness would have provided such evidence to prove the effects of these powerful medications on a person's mental state especially post-operative and in pain. The Petitioner was wearing a post-operative neck brace during the entire interview with stiches still in his neck. Duh! Ironically the court itself noted that the Petitioner appeared "relaxed" in what should have been a stressful situation and that this relaxed state somehow benefited the Petitioner. This alone proves an altered state of mind. This is as the court implied, not a normal state of mind for a person in such a situation. The Petitioner provided in his §2255 ("Reply", appendix 39, exhibit 2) a sworn statement from an experienced Medical Doctor to prove that medical evidence was available to prove the effects of the medications in question. Judge Herndon ignores this in his "Denial".

Still, the final pre-trial hearing on the day of trial concerning evidence is the worst case of disloyalty on record. The government was, of course, pressing to have as much of the Petitioner's past criminal history admitted as possible. This included testimony about crimes the Petitioner was never convicted of (production of child pornography). One major issue was the Petitioner's previous conviction for a sex offense and his status as a sex offender.

As the indictment contained different victims than the previous records and the crimes charged were different than the Petitioner's previous conviction there could be no probative value in the admittance of this information. The previous crime involved an assault. The current charges

5 4

involved no evidence of any assault. Since the current charges had nothing to do with the fact that the Petitioner is a registered sex offender and that fact had nothing do do with whether the Petitioner committed the crimes as charged, this status did not need to go to the jury. The only purpose for this would be to emotionally sway the jury against the Petitioner.

> "[t]he label 'registered sex offender' calls to mind shaming punishment use to mark an offender as someone to be shunned." SMITH v DOE, 853 U.S. 83,116

Even with this common sense knowledge of possible prejudice, Rosanswank advocated to the court to allow the jury to see this information. (Tr.3/2/09, pp.13, lines 4-24). He even goes so far as to state "Mr. Courtright's prior conviction ought to be brought out." (Tr.3/2/09,pp.17, line 24). In order to prove his disloyalty, Rosanswank states that the Petitioner's past is "very similar conduct that is described here... very similar." (Tr.3/2/09,pp.17-18, lines 25,1,7), this could only apply to the unconvicted production charge. There is no tactical, strategic, or loyal reason why any defense counsel would ever want such damaging information brought before a jury unless it was to cause a conviction.

> "[a]ttorneys adopting the role of judge or jury 'pose a danger of depriving their clients of the zealous and loyal advocacy

55

required by the Sixth Amendment'." NIX v
WHITESIDE, 475 U.S. 157,189; "Such an
attorney, like unwanted counsel, 'represents'
the defendant only through a tenuous and
unacceptable legal fiction." FARETTA v
CALIFORNIA, 422 U.S. 806,821

Even this court during the direct appeal recognized that
Rosanswank was not acting in the best interests of his client.
"[Mr. Rosanswank] countered that the instruction was
appropriate.." UNITED STATES v COURTRIGHT, 632 F.3d. 363,371.
This was referencing the fact that Rosanswank had approved
instructions that were more damaging to his client than the
correct instructions. What is worse is this Circuit Court used
the fact that the jury heard about the previous conviction and
sex offender status to determine that the testimony that was
inadmissible (as ruled by this court) did not cause
significant harm thereby harmless. Therefore had Rosanswank
been loyal, competent, and professionally working towards
being an effective ADVOCATE for the Petitioner, this past
crime evidence would not have been heard, thereby making the
inadmissible testimony harmful not harmless.

"[T]he duty of loyalty is perhaps the most
basic of counsel's duties." STRICKLAND v
WASHINGTON, 104 S.Ct. 2067

There can be no loyalty when defense counsel chooses to
NOT work in his clients best interests and prevent his client

from being convicted due to past history.

## FAILURE TO PRESENT AN ADVERSARIAL DEFENSE

To provide effective assistance defense counsel is required to adversarialy test the governments case against his client.

> "[I]f the process looses its character
> as a confrontation between adversaries,
> the constitutional guarantee is violated."
> UNITED STATES v CRONIC, 466 U.S. 648,656-57

Instead of confronting the government's case on cross examination, Rosanswank merely confirmed the witnesses testimonies against the Petitioner. Considering that everything said by the government's witnesses was incriminating to the Petitioner, this was telling the jury that there was no defense and that Rosanswank agreed with everything the government was saying. There are numerous examples of this. The Petitioner included a listing of these events in the Petitioner's "Reply" appendix 29, attachment 2. For brevity the Petitioner will only list a few here.

The Petitioner was not facing any charges for any physical offenses. Still the government provided a narrative to show a progressive physical intent leading to the production charge. A loyal and competent attorney would challenge this chain of events. Instead Rosanswank tells the jury he believes the Petitioner "rubbed lotion" on the victim

57

S.J., climbed in the bed with S.J., but "he didn't touch you
inappropriately" (Tr.3/4/09,pp.115-122). Huh??? The only
witness to these events is the victim and the Petitioner. The
Petitioner does not, cannot and has not claimed the events
ever occurred. Yet Rosanswank tells the jury that he believes
they did, just that there was no "inappropriate" touching.
Instead of advocating for the defense, Rosanswank was
advocating for the government.

> "[t]hus the adversarial process protected
> by the Sixth Amendment requires that the
> accused have counsel acting in the role
> of an advocate." ANDERS v CALIFORNIA, 386
> U.S. 738,743

Even with all of this direct trial evidence, Judge
Herndon states that Rosanswank provided "adequate
representation". ("Denial",pp.12). He basis this on the
"entire record". The judge states that Rosanswank declared a
strategy. "Rosanswank argued that others had access to the
computers and that Courtright was set-up." ("Denial",pp.12).
How can this be a defense without evidence or witnesses for
the defense to substantiate the facts? It cannot.

> "[F]ailure to produce expert witnesses in
> support of defense theory introduced in
> opening statement is a 'speaking silence'
> that is prejudicial as a matter of law."
> HARRIS V REED, 894 F.2d 871,879 (7th Cir 1991)

If the strategy was that others had access, then Rosanswank would have, at minimum, called family and friends whom regularly visited the residence on Century Drive to testify to who they saw using the computers there. Not even this minimalist approach to a defense was done. Yet for some reason the judge feels that this was Rosanswank's defense.

> "[J]ust as a reviewing court should not second guess the strategic decisions of counsel in hindsight, it should not construct strategic defenses which counsel does not offer."DAVIS v LAMBERT, 388 F. 3d 1052,1064 (7th Cir 2003)

As the § 2255 motion record indicates, Rosanswank declined to give any statements or affidavits to rebut the Petitioner's claims for this record. Without counsel's own words, the court is "out-of-place" when it states that a defense or strategy or tactic was given when the Petitioner's statements and affidavit rebut that assumption.

Rosanswank was ineffective and did not present himself as an advocate for the defense. He worked in an apparent and improper collusion with the government in order to secure a conviction against his client. Had a defense been provided, the governments case would have been challenged and there is a "reasonable probability" that the verdict would have been different. According to the records (Cr.Doc.124), Rosanswank was handsomely paid $24,618.22 to NOT act as an advocate for

the defense. I think the taxpayers should request a refund.

## ROSANSWANK FAILED TO OBJECT AND CHALLENGE PROSECUTORIAL MISCONDUCT

Because the Petitioner was represented by counsel, it was imperative for counsel to monitor the conduct of the government and to not allow prejudicial events to occur without a challenge.

> "[O]ne of defense counsel's most important
> roles is to ensure that the prosecutor
> does not transgress the bounds of proper
> conduct." WASHINGTON V HOFBAUER, 229 F.2d
> 689,709 (6th Cir 2000)

Judge Herndon, again in agreement with the government, states that the Petitioner:

> "merely seize[s] upon various phrases he
> deems inappropriate and inflammatory from
> the lengthy trial transcript..."
> ("Denial",pp.18)

This is a false statement. Of the incidents referenced by the Petitioner, more than 57 occurred on less than 30 pages on the same day during the same time frame. This equals approx. 2 per minute when spoken. Of these 57 occurrences, Rosanswank objected to ZERO. The Petitioner made a list of these

incidences in "Reply", appendix 31, attachment 3.

To show the degree of misconduct the prosecutor went so far as to say "There is no reasonable doubt." (Tr.3/6/09,pp.28, lines 22-23). Neither the court nor defense counsel corrected this statement made as a statement of fact by the government. This statement directly tells the jury that there is no other side to the case and no defense available to cause reasonable doubt.

> "[A] prosecutors comments that the government's evidence on an issue is uncontradicted, undefined, unrebutted, undisputed [e.g. there is no reasonable doubt"], will be a violation of the defendant's Fifth Amendment rights if the only person who could have contradicted, denied, rebutted, or disputed the government's evidence was the defendant himself." UNITED STATES v. COTNAM, 88 F.3d 487 (7th Cir 1996)

Because Rosanswank failed to present ANY defense, "the defense will be resting when he jury returns to the courtroom." (Tr.3/6/09, pp.3, lines 14-15), the only possible defense to create reasonable doubt would have been if the Petitioner had waived his Fifth Amendment rights and testified. Therefore the statement "there is no reasonable doubt" was a reference (direct or indirect) to the Petitioner's silence. The prosecutor did not say "the evidence shows there can be no reasonable doubt" as would be permitted,

instead, she removes all reasonable doubt. Because she
represents the United States of America, and we all love our
country, when she speaks jurors listen. The United States says
there is no doubt, then there is no doubt!

The prosecutor even suborns perjured testimony. One
witness, Drew Johnson, the victim S.J.'s father, testified on
direct that no promises were made to Mr. Johnson, indicating
that he could face prosecution for the multiple heinous
felonies that he testified to in open court (Tr.3/4/09,pp.67,
line 16). In juxtaposition, on cross, Rosanswank questions Mr.
Johnson and is told that he (Mr. Johnson) has escaped all
"legal" responsibility for his criminal conduct as testified
to (Tr.3/4/09, pp.39, lines 15-17). Somebody is not being
honest. The government, the witness, who? Rosanswank was
obligated to move for impeachment of the witness and a
striking of his testimony from record. Even the court was
obligated to notice the perjury and sua sponte move for
impeachment. Instead the government and eventually this court
on direct appeal used the testimony of Drew Johnson to
maintain a conviction against the Petitioner.

### ROSANSWANK FAILED TO INVESTIGATE, HIRE EXPERTS, AND WAS INEXPERIENCED

There was no expert testimony presented to support the
theory of defense. Rosanswank merely confirmed the
government's version of information when he cross-examined the
witnesses. If Rosanswank had a rebuttal witness to disprove
the testimony, then this might have been a sound tactic.

However what resulted with no rebuttal witnesses is the
defense confirmed the government's case from beginning to
end.

> "[I]t is not enough to assume that counsel
> thus precipitated into the case thought
> there was no defense, and exercised their
> best judgement in proceeding to a trial
> without preparation. Neither they nor the
> court could say what a prompt and thorough-
> going investigation might disclose as to
> the facts. No attempt was made to investigate."
> POWELL v. ALABAMA, 287 U.S. 45,58

Rosanswank, on record, told the court that he was not
prepared. The court still forced a trial date claiming
Rosanswank was prepared. However there were no witnesses for
the defense, no expert opinions on any aspect of the internet,
cable modem, computer, image manipulation, or literally
anything prepared for trial. Rosanswank told the Petitioner
that he was not that computer "savvy" and even told the court
that he was "not a computer expert" (Tr.3/3/09,pp.53-54, lines
25,1). Rosanswank told the Petitioner he had never dealt with
a child pornography case before. Rosanswank told the
Petitioner that he new nothing about Limewire®, or computer
images, or cable modems, or any other technical aspect of the
entire case. This is incompetence and violates the effective
assistance of counsel guarantee of the Sixth Amendment.
Rosanswank, quite literally let the "reasonable doubt"

slip through his fingers. In Judge Herndon's court, the jury is given an opportunity to write specific questions for witnesses to answer. After the court and counsels have approved the question, it is then asked. On the fourth day of trial, a juror asked the government's witness "is there a way to tell, with respect to the Hewlett Packard Laptop, which location the laptop was being used at a particular time, whether specifically at the physical address Century Drive versus the physical address Madison Ave, by virtue of the IP address?" (Tr.3/5/09, pp.203-204, lines 19-25,1-2). The government's witness answered that because the IP was billed to Century Drive and not Madison Ave that all the activity happened on Century Drive. This is another lie by the prosecution. Had Rosanswank had an expert witness from Charter Cable, they would have testified that any Charter device (modem, converter box, phone), will work from ANY house that has an active Charter Cable line. The witnesses already testified that the Hewlett Packard Laptop was on Madison Ave during the times charged. This would have proven that somebody else could have done the crime. Without an expert rebuttal, the case was lost at that moment.

Failure to hire experts to supplement Rosanswank's short comings, experience and knowledge falls below the standard of effectiveness. It is as if Rosanswank thought the government's witnesses were going to all of the sudden become defense witnesses. Instead of having defense witnesses oppose the government, Rosanswank went with the status quo and helped confirm a conviction.

"[I]ndeed, an indispensable element of
the effective performance of responsibilities,
is the ability to act independently of
the government and to oppose it in adversary
litigation." FERRI v ACKERMAN, 444 U.S. 193,204

Rosanswank was NOT independent. He was in fact dependent
on the government to provide the witnesses to confirm any
theory of defense. The Petitioner is prejudiced because
without adversarial litigation, there is no fair trial and
there is no justice. The Petitioner is now convicted and
serving life because of Rosanswank's failures.

VI. ROSANSWANK FAILED TO MOVE FOR A DISMISSAL OF COUNT 5 (BANK
FRAUD) WHEN THE GOVERNMENT'S CASE CONTAINED NO EVIDENCE THAT
THE PERSON ACTUALLY GUILTY OF THE CRIME WAS THE PETITIONER.

Judge Herndon is correct in his "Denial" pp.22, when he
states that the government did present evidence of Bank Fraud.
No doubt. The government presented forged checks, testimony of
the teller who took possession of the checks, testimony from
various investigators stating the checks were fraudulent, as
well as the checks themselves.

What the government did not present was surveillance
images from Regions Bank that identify any person at the Bank
when the deposit was "attempted". There is no witnesses that
indicate who the person(s) might have been on that day at that
time making such a deposit. There is no handwriting evidence,
fingerprints, DNA, or anything else to prove the Petitioner,
or any other specific person attempted to make the deposit.

Yes, there might have been an attempted fraud, but no, there was no evidence as to who did this.

The Petitioner's conviction rests on evidence of ID card printers not alleged to be used in the Bank Fraud charge, credit card scanners not alleged to have been used in the Bank Fraud charge, fake ID's not alleged to have been used in the Bank Fraud charge, testimony of Drew Johnson stating that he saw the Petitioner make deposits to Regions Bank with no specificity of time or actual locations, and heresy evidence of some unconfirmed letter that the bank security department received allegedly from the Petitioner.

The Petitioner cannot suffer a conviction because he might be a con-man and might have committed bank fraud some other time. The conviction can only stand if the Petitioner is the only person who could have committed the fraud. Contrary to the government's case, Ms Gorovsky makes much to do about the fact the Petitioner was running a website and soliciting donations. On this website is the Petitioner's account number, bank address, and instructions to make donations directly to the bank, not to the Petitioner. Rosanswank failed to "exploit" this exculpatory evidence that without evidence of who, literally anybody in the world with internet access could have made this deposit.

It appears that the government felt she did not prove the Petitioner culpable for the crime. Because of her desire for a conviction, she told the jury that because the Petitioner was the only signature on the bank signature card, that he was the only person who could make deposits. Yet another lie. Even this court knows that you can make a deposit without any form

of ID. Night Deposit Drops made by the McDonald's® manager
don't require signatures. Only withdrawals of information
changes to an account require signatures. Yet Rosanswank
allowed this lie to go unchallenged. This kind of contradicts
her earlier remarks about the Petitioner soliciting donations
on his website. Either way, the Petitioner was convicted
because the United States said he was the only person who
could have made the attempted deposit.

To further complicate things, Rosanswank failed to
challenge the forfeiture and restitution that was assigned due
to this attempted fraud. Yet the record indicates along with
the PSR that this was an attempted Bank Fraud. There are no
proceeds of the crime if the crime was merely an attempt just
like the person did not die if it was an attempted murder.
With no loss due to the Bank Fraud charge, there can be no
restitution of funds received. The only inference to a loss
was hearsay testimony from the bank officer, without any bank
receipts or records to confirm, that the Petitioner's account
had a negative balance and the bank lost money. No dollar
amounts of loss and no evidence that the attempted Bank Fraud
caused any loss itself as charged.

Ineffective? Yes! Rosanswank was obviously working for
the government to have missed these glaring facts. Had he
challenged them, the verdict would have been vacated and the
Petitioner would not be paying restitution and forfeitures.
There would be no conviction and no prison time due to said
conviction. Gareth Morris was ineffective for failing to
appeal this conviction on these same grounds. This court would
have vacated the judgements on appeal as the evidence is

overwhelming to support the Petitioner's arguments.

VII. THE SEVENTH CIRCUIT COURT OF APPEALS CREATED A SITUATION
THAT CONSTRUCTIVELY DENIED EFFECTIVE ASSISTANCE OF COUNSEL
WHEN THE CIRCUIT COURT RELIED ON THE GOVERNMENTS FALSE VERSION
OF EVIDENCE THAT IS NOT IN THE RECORD

Gareth Morris was appointed as appellate attorney for the
Petitioner's direct appeal. Morris presented arguments based
on the rules of evidence and inadmissible testimony. In part
this court agreed with the arguments and gave a favorable
ruling towards the Petitioner, however the ruling was said to
be a harmless error based on specific evidence of guilt of the
Petitioner. It is this court's version (from the government's
version) of evidence that is false.

This court ruled the inadmissible testimony and ensuing
improper jury instructions as harmless because:

First, the court states "Courtright first took up his
hobby in 1998." UNITED STATES v COURTRIGHT, 623 F.3d 363,365
(7th Cir 2011). However careful review of this court's own
records will show that the 1998 allegation was related solely
to the testimony of Lisa Miller that this court deemed
inadmissible. Therefore any reference to this is false. To
further complicate the issue, the testimony of Lisa Miller of
any photography was related to a charge that was dropped and
there was not evidence or conviction to support.

Second, this court states "at one point during the shoot,
Courtright told Miller that he had some medical knowledge..."
id. @ 366. Not only is this in reference to the already
declared inadmissible testimony of Lisa Miller, but the

68

testimony does not exist on record. Miller clearly stated that her testimony about any pictures were a separate incident from the convicted assault charge against the Petitioner. They were said to have been months apart in time. Not "one time during...".

Third, this court states that S.J. (the current victim), had her face "obscured", id.@ 366. Yet when the evidence is reviewed, ALL the images charged against the Petitioner of S.J. were "headless" shots of a female. There was no head and thus no face to "obscure".

Fourth, this court states that S.J. was "rebuking" the Petitioner's advances. Yet the testimony of S.J. shows the Petitioner was never even said to have made any inappropriate passes of contact to S.J.

Fifth, this court then states that the Petitioner "put his finger in [S.J.'s] vagina." Again careful review will show that this testimony actually belongs to Lisa Miller (the inadmissible testimony). S.J., on cross, very clearly articulated that the Petitioner NEVER inappropriately touched her. This begs the question that if the government and this very experienced court can mix up all of these facts, how much more confused was the jury in determining who said what?

Sixth, according to the government during trial, Drew Johnson was angry with the Petitioner. She asked him how he felt about the Petitioner and he stated basically that the Petitioner is lucky he is alive because nobody gets by with harming his daughter. With this knowledge the next statement by this court makes no logical sense. This court states that "S.J.'s father [Drew Johnson] testified that Courtright had

asked him about taking photographs of S.J.". id. @ 370. Not only would the Petitioner be in physical danger for asking such a thing (as the government infers these "photographs" would have been nude images), but it contradicts Drew Johnson's own testimony. According to Drew on cross, he had NO KNOWLEDGE of any photographs until he was approached by the police after the images were discovered.

Seventh, this court states that the Petitioner "engaged in sexually explicit conduct with THEM." id. @ 370 (emphasis mine). However if Lisa Miller's testimony is inadmissible, there is no "them". Second S.J. specifically stated there was no sexual conduct with her.

Eighth, this court then states that the Petitioner's cellmate testified that the Petitioner confessed to taking pictures of a "young girl" id. @ 370. Careful review of the actual testimony will reveal that Adolph Paulson stated "young lady" and not "young girl". In the English language and in common usage girl implies adolescent or younger whereas lady implies adult. "When my daughter celebrated her 18th birthday I noticed that she had grown into a beautiful young lady. Before she grew-up, she was a very beautiful young girl." The implication is that somehow Paulson's testimony indicates child pornography when in fact it does not.

It appears that the government's plans worked. Somehow this court was totally mislead into believing a fictitious version of the trial as opposed to what really happened. The Petitioner assumes that this was inadvertent and due to the strenuous schedule of this court. However it is still fact that the facts used were wrong.

70

Gareth Morris, due to the efforts of the government to mislead this court and the fact that the governments efforts worked in misleading this court, was rendered ineffective. This constitutes Constructive Denial of counsel and the CRONIC exception must apply to this case. Had the information been accurate, there is a more than reasonable probability that this court would have ruled that the errors of testimony and jury instructions were not harmless thereby triggering some relief towards the Petitioner on direct appeal.

VIII. THE ACCUMULATION OF ALL THE ABOVE ERRORS DEMAND RELIEF IN THE FORM OF A VACATED JUDGEMENT IN ALL COUNTS AND ATTACHING DOUBLE JEOPARDY DUE TO PROSECUTORIAL MISCONDUCT AND ABUSE OF JUDICIAL DISCRETION

Each of the above claims are great enough violations to merit relief. However if this court finds any of the claims "harmless" the mere accumulation of all these facts of injustice are cause for relief.

As these claims revolve around prosecutorial misconduct, judicial abuse of discretion as well as ineffective assistance of counsel, the only solution is to vacate the judgements, sentences and attach double jeopardy to these offenses and any other results of the same instant case. Such a ruling would cause the effect of (hopefully) preventing prosecutors from abusing their positions and resulting to the "cheat you to beat you" mentality in order to obtain convictions. This would also place members of the defense bar on alert to zealously advocate for their clients and no longer "go with the flow" by merely doing the minimal and even less in their representation

of defendants. Finally this would send a message to the
Jurists who preside over cases that they are accountable for
their actions when those actions are no longer impartial,
fair, or even within the rules. When judges become an
extension of the prosecution in cases the entire system falls-
a-part and there is no longer justice, but tyranny. This is
not the goal of this Great Nation. We are a people of rights
and these rights protect ALL citizens equally.

CONCLUSION

Based on the overall record of Mr. Rosanswank's failures
either by Constructive Denial, or his own unprofessional
incompetence and the failures of Mr. Morris on appeal, the
facts are beyond contestation. The Petitioner has suffered one
of the largest miscarriages of justice that this area has
seen. It appears that the Petitioner was convicted because he
has a previous sex offense. This is surely why the
investigation was started with no reports of any crimes. This
is also why the Detective neglected his Constitutional duties
and preformed an illegal search and seizure. IT seems to also
be the basis for this Circuits ruling to uphold the
Petitioner's conviction on direct appeal. If the Petitioner
was a first time offender, there would not have been an
investigation, trial, or conviction. The Petitioner's MySpace®
page never infringed upon any others rights. No crimes were
committed because the Petitioner was a registered sex offender
on MySpace®. No crimes were committed because the Petitioner
is a registered sex offender.

72

This "Salem Witch Trial" mentality exercised by law enforcement needs to be controlled. This circuit cannot allow ANY persons right to be violated based on a past history. This is not the way the system is written to work.

The Petitioner prays for the court to vacate all the charges and sentences against the Petitioner and due to the nature of prosecutorial misconduct and judicial interference, double jeopardy should attach.

The above motion is true and correct and all the information included is true and correct. The undersigned certifies under the penalties of perjury to the entirety of this motion.

Carl Albert Courtright, III
Reg.No. 07860-025 A-1/227L
United States Penitentiary
P.O.Box 24550
Tucson, Arizona 85734-4550

73

UNITED STATES CIRCUIT

COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| CARL ALBERT COURTRIGHT, III, | ) On Appeal from the United |
| Petitioner, | ) States District Court for the |
| | ) Southern District of Illinois |
| | ) (East St. Louis) |
| vs. | ) RE: Case No. 12-cv-1078-DRH |
| | ) 07-cr-30179-DRH |
| UNITED STATES OF AMERICA, | ) Honorable David R. Herndon |
| Respondent. | ) United States District |
| | ) Chief Judge Presiding. |

CERTIFICATE OF COMPLIANCE WITH FED.R.APP.P.32(a)(7)

The undersigned, being a pro se inmate Petitioner, has exceeded the allowed word count in the forgoing document. In accordance with Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32, the volume is limited to 14,000 words. Over 1150 of these words are a part of the required jurisdictional statement and header as well as other technically required portions of this brief. The Petitioner certifies that the actual total word count is 15,924 and only 14,750 in the actual argument sections (as counted by the Word-processing Tool NEO® by Alphasmart® provided to inmates at USP Tucson, Arizona that was used to prepare this brief.)

Carl Albert Courtright, III

D 4.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

CARL A. COURTRIGHT, III,

     Defendant.                  No. 07-cr-30179-DRH

## MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

Now before the Court is defendant Carl A. Courtright, III's, motion for Rule 36 correction of clerical error on order of judgment (Doc. 185). FEDERAL RULE OF CRIMINAL PROCEDURE 36 states, "[a]fter giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Fed. R. Cr. P. 36.

Courtright's criminal judgment contains the following special instruction regarding the payment of monetary penalties:

> The defendant shall pay any financial penalty that is imposed by this judgment **and that remains unpaid** at the commencement of the term of supervised release. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be paid in equal monthly installments of $50 or ten percent of his net monthly income, whichever is greater, over a period of 102 months, to commence 30 days after release from imprisonment to a term of supervision.

(Doc. 115, p. 7, ¶ F) (emphasis added). Courtright requests that the Court delete the words, "and that remains unpaid" from his judgment. He states these words are in error, as the undersigned did not specifically state them at his sentencing hearing. Upon reviewing Courtright's judgment and the transcript of his sentencing hearing, the Court now clarifies that Courtright's judgment is correct. Courtright has not presented the Court with a clerical error. Thus, his motion is **DENIED** (Doc. 185).

    **IT IS SO ORDERED.**

    Signed this 4th day of October, 2013.

David R.
Herndon
2013.10.04
17:48:30
-05'00'

**Chief Judge**
**United States District Court**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

CARL A. COURTRIGHT, III,

     Defendant.                No. 07-cr-30179-DRH

### ORDER

HERNDON, Chief Judge:

Now before the Court is defendant Carl A. Courtright, III's, "writ of mandamus to compel this court to exercise its legal duty under the law" (Doc. 187). The Court construes Courtright's motion as a motion to reconsider this Court's denial of Courtright's "motion for Rule 36 correction of clerical error on order of judgment" (Doc. 186). The Court must again reiterate that there is no clerical error in Courtright's judgment. Thus, this Court is without jurisdiction to entertain Courtright's arguments. On this basis, his motion is denied (Doc. 187).

     **IT IS SO ORDERED.**

Signed this 30th day of October, 2013.

Digitally signed by
David R. Herndon
Date: 2013.10.30
16:05:34 -05'00'

**Chief Judge**
**United States District Court**

Page 1 of 1